CITY OF LOS ANGELES, a
Municipal Corporation

v.

Brock ADAMS, as Secretary of Transportation of the United States, et al., Appellants.

No. 75–1965.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 13, 1977.

Decided March 30, 1977.

David M. Cohen, Atty., Dept. of Justice, Washington, D.C., with whom Rex E. Lee,

Asst. Atty. Gen., Earl J. Silbert, U.S. Atty., and Robert E. Kopp, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellants. Morton Hollander, Atty., Dept. of Justice, Eric B. Marcy, Asst. U.S. Atty., Washington, D.C., also entered appearances for appellants.

Ronald J. Einboden, Deputy City Atty., Los Angeles, Cal., with whom Lawrence M. Nagin, Sp. Counsel to the City Atty., Los Angeles, Cal., was on the brief, for appellee.

Before WRIGHT, TAMM and LEVEN-THAL, Circuit Judges.

Opinion for the Court filed by Circuit Judge LEVENTHAL.

LEVENTHAL, Circuit Judge:

This case arises from tension between substantive legislation and the corresponding appropriations. The district court granted relief to the City of Los Angeles based on its conclusion that the city had a vested right to funds for the development of its airport, as allocated to it by the Airport and Airway Development Act of 1970, 49 U.S.C. §§ 1701 *et seq.* (the "Act"). This right was held to be firm in amount despite the fact that subsequent appropriations limited expenditures to less than that provided by the Act.

We have attentively examined the pertinent enactments and legislative history in order to discern Congress's intent. We conclude that the amount of dollars available for the airport development program was determined by the appropriations measures passed by Congress. However, the Federal Aviation Administration (FAA) went too far when it, in effect, used the discrepancy between the substantive provisions of the Act and the provisions of the appropriations laws as a hinge for enlarging its discretion to decide which projects to fund. The sound underlying doctrine calls for an inter-mesh of the measures that provides maximum possible respect for and application of both measures. We conclude that in this case the appropriations acts can be given full effect in limiting the amounts available, while the Act is given maximum effect, within the appropriations constraints, in dictating how the limited amounts should be allocated and administered.

On remand, the district court will compose a suitable decree to implement this opinion.

## I. THE LAWSUIT AND DISTRICT COURT ORDERS

The City of Los Angeles owns and operates the Los Angeles International Airport. The City applied in October, 1974, to the FAA for a grant to reimburse it for part of a $21.4 million land acquisition for expansion of the Airport. It applied for $11.5 million under the provisions of the Act, but only claims $9.6 million as of right from its entitlements accrued in fiscal years (FY's) 1974 and 1975.

In March, 1975, the FAA informed the City that the grant would not be made, in spite of the acceptability of the project and the City's apportionment under the enplanement provisions of the Act (which will be discussed presently). This denial was based on the FAA's position that it was obliged to distribute less funds than apportioned by the Act, that it had instituted a priority system to choose which projects to fund, and that other projects with higher priority than Los Angeles's land acquisition would exhaust the available funds.

The City brought suit on May 1, 1975, seeking declaratory and injunctive relief to compel execution by the FAA of a $9.6 million grant. On May 2, the district court granted a temporary restraining order that prohibited the FAA from granting the $9.6 million to anyone other than the plaintiff. This was followed by a preliminary injunction on May 14 and a memorandum opinion on June 23, finding Los Angeles entitled to the grant. *City of Los Angeles v. Coleman*, 397 F.Supp. 547 (D.D.C.1975). This was enforced in an order of June 26, 1975.

## II. AIRPORT DEVELOPMENT PROGRAM

The Airport and Airway Development Act of 1970, 49 U.S.C. §§ 1701 *et seq.*,

provides for the formulation of a national airport system plan, § 1712, and for federal funding of airport development, § 1714, from a trust fund accumulated from air transportation use taxes, § 1742.

The amount available for airports was the subject of § 14(a) of the Act, 49 U.S.C. § 1714(a).[1] This authorized the Secretary of Transportation—who has delegated his duties under the Act to the FAA—to make grants of "not less than" $250 million in each of FY's 1971–75 for airports serving CAB certified carriers and certain general aviation airports, with $30 million for other airports. In 1973, these amounts were increased to $275 and $35 million, respectively, for FY's 1974–75.

Apportionment of funds for airports is governed, as to the larger airports, by § 15(a)(1) of the Act, codified as 49 U.S.C. § 1715(a)(1).[2] This subsection requires that the funds be apportioned: (1) one-third to the states in proportion to their area and population, (2) one-third to existing airports serving CAB certified carriers in proportion to passengers served (the "enplane-

ment formula"), and (3) one-third to be distributed at the discretion of the FAA (discretionary fund). Section 1715(a)(3) provides that amounts apportioned to "sponsors" (public airport authorities applying for airport development grants) under the enplanement formula are to be available for approved airport development projects for the year in which apportioned and two successive years. Any sums not obligated by grant at the expiration of that time are transferred to the discretionary fund.

■ Congress plainly intended mandatory apportionment of the amounts specified in § 1714(a) to airport sponsors according to the three-fold formula of § 1715(a). The Senate Report explained the policy behind this formula:

This apportionment formula will satisfy two important needs. First, it will assure that at least one-third of the total funds will be expended in the airport areas of the highest traffic density and where the need is greatest. Secondly, by apportioning at least one-third of the

---

1. § 14(a) of the Act, as passed in 1970, provided:

In order to bring about, in conformity with the national airport system plan, the establishment of a nationwide system of public airports adequate to meet the present and future needs of civil aeronautics, the Secretary is authorized to make grants for airport development by grant agreements with sponsors in aggregate amounts not less than the following:

(1) For the purpose of developing in the several States, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands, airports served by air carriers certificated by the Civil Aeronautics Board, and airports the primary purpose of which is to serve general aviation and to relieve congestion at airports having a high density of traffic serving other segments of aviation, $250,000,000 for each of the fiscal years 1971 through 1975.

(2) For the purpose of developing in the several States, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands, airports serving segments of aviation other than air carriers certificated by the Civil Aeronautics Board, $30,000,000 for each of the fiscal years 1971 through 1975.

49 U.S.C. § 1714(a).

2. Section 15(a)(1), 49 U.S.C. § 1715(a)(1) provides:

As soon as possible after July 1 of each fiscal year for which any amount is authorized to be obligated for the purposes of paragraph (1) of section 1714(a) of this title, the amount made available for that year shall be apportioned by the Secretary as follows:

(A) One-third to be distributed as follows:

(i) 97 per centum of such one-third for the several States, one-half in the proportion which the population of each State bears to the total population of all the States, and one-half in the proportion which the area of each State bears to the total area of all the States.

(ii) 3 per centum of such one-third for Hawaii, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands, to be distributed in shares of 35 per centum, 35 per centum, 15 per centum, and 15 per centum, respectively.

(B) One-third to be distributed to sponsors of airports served by air carriers certificated by the Civil Aeronautics Board in the same ratio as the number of passengers enplaned at each airport of the sponsor bears to the total number of passengers enplaned at all such airports.

(C) One-third to be distributed at the discretion of the Secretary.

available funds to projects in the States using the "area/population" formula, projects in smaller States and those projects which are not of primary importance will not be neglected.

In addition, the Committee believes it important that the Secretary have at his discretion a significant portion of the allocated revenue in order to provide additional financial assistance to projects which have a high priority in the National Airport System Plan. The discretionary fund may be particularly useful in assisting development of new jetport facilities being planned in the high density hub areas in which a high initial investment is required.

S.Rep. No. 565, 91st Cong., 1st Sess. 28 (1969).

In addition to assuring return of one-third of the funds to their airports of origin to deal with current congestion, the Senate Report stresses the need for commitment of certain minimum sums to airport sponsors to facilitate long term planning. *Id.* at 22, 25:

Second, the program, which has been subject to annual appropriations for general revenues, has failed to provide a firm, long term and reliable source of revenue upon which airport sponsors could depend for Federal grant-in-aid assistance. The vagaries of year-to-year general appropriations coupled with the fact that grant recipients were generally chosen on a year-to-year basis, and could never rely upon any certain level of Federal assistance, in effect, rendered Federal grants under the program less effective than is now necessary.

\*　　\*　　\*　　\*　　\*　　\*

Second, the Federal Government must provide assurances that project grant assistance will be available and predictable over a relatively long time period and that grants to the airports most in need will be available in some minimum amounts.

\*　　\*　　\*　　\*　　\*　　\*

First of all, this bill is a long-range program in that trust fund revenues for airport development grants are authorized for expenditures for 10 years. In addition to providing a full 10-year authorization of trust fund revenues for airport development grants, the committee believes it equally important to establish a 10-year allocation of user charge derived trust fund revenue for airport development grants, subject to review, so that airport operators may be assured that a minimum level of airport development grants will be available during the program period.

Next, a reasonable apportionment of the airport development funds is made, again subject to review in 5 years, which will guarantee that some of the airport development funds authorized will be reserved for those airports whose needs are the greatest.

As originally enacted, § 1714(b) contained an overall limitation of $840 million on the amount to be obligated in the first five years of the program.[3] As the federal officials defending the lawsuit point out, the $840 million limit in § 1714(b) is inconsistent with interpreting § 1714 (a) to provide a full entitlement to $280 million annually for five years. However, the last sentence of § 1714(b) suggests that from the start Con-

---

**3.** Section 14(b) of the Act provided in full:

To facilitate orderly long-term planning by sponsors, the Secretary is authorized, effective on May 21, 1970, to incur obligations to make grants for airport development from funds made available under this subchapter for the fiscal year ending June 30, 1971, and the succeeding four fiscal years in a total amount not to exceed $840,000,000. No obligation shall be incurred under this subsection for a period of more than three fiscal years and no such obligation shall extent beyond June 30, 1975. The Secretary shall not incur more than one obligation under this subsection with respect to any single project for airport development. Obligations incurred under this subsection shall not be liquidated in an aggregate amount exceeding $280,000,-000 prior to June 30, 1971, an aggregate amount exceeding $560,000,000 prior to June 30, 1972, and an aggregate amount exceeding $840,000,000 prior to June 30, 1973. 49 U.S.C. § 1714(b) (1970). Note the statutory emphasis on long term planning.

gress may have intended finality for the first three years of the program, with a second look for the last two years. In any event, that is what Congress did when it amended the Act in 1973. P.L. 93–44, § 3, 87 Stat. 89 (1973). The amendment raised the authorization amounts of § 1714(a) from $280 million to $310 million for FY's 1974–75. The same 1973 law amended § 1714(b).[4] Summarizing this not uncomplicated amendment, the limit on cumulative obligations to be liquidated was extended through FY 1975 and reconciled with the minimum amounts set forth in § 1714(a). These provisions had the effect of using the same amounts as both minima and maxima, as to the amounts to be obligated under each part of the formula. Technical problems were generated by the amendment but as to the case before us, which concerns what the FAA was required to grant in FY 1975, there is no inconsistency or ambiguity in the Act's mandate to the FAA.

### III. APPROPRIATIONS ACT LIMITATIONS

In each year's appropriations act for the FAA, there was a nearly identical provision limiting the FAA's administrative funds, a provision which in our view put specific limits on the amount of total airport development grants. For example, the appropriations measure for FY 1975[5] provided:

> None of the funds provided in this Act shall be available for administrative expenses in connection with commitments for grants-in-aid for airport development aggregating more than $310,000,000 in fiscal year 1975.

The FAA correctly interpreted § 302 and its predecessors as substantive limitations on its granting authority.

The problem of grants in FY 1975 arises in large part from the circumstances that during FY's 1971, 1973 and 1974, the FAA obligated even less than was available under its own interpretation of the annual appropriations acts.[6] By FY 1975, there was a backlog of $193.7 million allocated to sponsors, but not obligated. Under the FAA interpretation, it was prohibited from liquidating the sponsors' "entitlements" under the Act—the FY 1975 apportionments plus the backlog—by the statutory deadline of June 30, 1975 that ended FY 1975.

The district court ruled that "[t]he Appropriations Act does not alter the obligation power in any way but rather serves to limit FAA administrative expenses."[7] The district court reasoned that it would be "illogical" of Congress to limit the FAA's obligational authority with the result of freezing money in the Trust Fund.[8]

---

**4.** At the time suit was brought, section 14(b) read:

> To facilitate orderly long-term planning by sponsors, the Secretary is authorized, effective on May 21, 1970, to incur obligations to make grants for airport development from funds made available under this subchapter for the fiscal year ending June 30, 1971, and the succeeding four fiscal years in a total amount not to exceed $1,460,000,000. No obligation shall be incurred under this paragraph for a period of more than three fiscal years and no such obligation shall be incurred after June 30, 1975. The Secretary shall not incur more than one obligation under this paragraph with respect to any single project for airport development. Obligations incurred under this paragraph shall not be liquidated in an aggregate amount exceeding $280,000,000 prior to June 30, 1971, an aggregate amount exceeding $560,000,000 prior to June 30, 1972, an aggregate amount exceeding $840,000,000 prior to June 30, 1973, an aggregate amount exceeding $1,150,000,000 prior to June 30, 1974, and an

> aggregate amount exceeding $1,460,000,000 prior to June 30, 1975.

49 U.S.C. § 1714(b) (Suppl. IV 1974).

**5.** P.L. 93–391, § 302, 88 Stat. 780 (1974).

**6.** The boxscore for each year of the program appears in the following table. All figures are in millions (M).

| FY | Minimum Annual Authorization (M) | Appropriations Act | Administrative Limit (M) | Actually Obligated (M) | Backlog (M) |
|---|---|---|---|---|---|
| 1971 | $280 | P.L. 91-645 | $250 | $170 | $110 |
| 1972 | $280 | P.L. 92-74, § 303 | $280 | $280 | $110 |
| 1973 | $280 | P.L. 92-398, § 302 | $280 | $206.6 | $183.4 |
| 1974 | $310 | P.L. 93-98, § 302 | $300 | $299.7 | $193.7 |
| 1975 | $310 | P.L. 93-391, § 302 | $310 | ? | |

**7.** *City of Los Angeles v. Coleman,* 397 F.Supp. 547, 556 (D.C.1975).

**8.** It would thus be illogical for Congress to pass a limitation on yearly obligational authority with the result that some 193 million dollars is left frozen in the Trust Fund with no way

The district court's interpretation would mean that this $310 million figure—which reflected an annual tussle between the House (favoring a slightly lower figure) and the Senate—was a solemn combat to declare an amount which in any event was far in excess of *administrative* expenses. It seems obvious to us that numbers like $310 million are intended to relate to the amounts of the grants to sponsors, not to the FAA's expenses (salaries, travel, stationery, and the like) in making the grants.

The reasonably clear meaning of § 302 is this: Congress used the "administrative expenses" provision as a device to limit total grants made in each year. This interpretation is supported by the plain and natural meaning of the words used; by the absurdity of a contrary construction; and by the legislative history of the appropriations measure.[9] Year after year, the House proposed these limitations, the Senate objected that they were inconsistent with the provisions and purposes of the Act, and the House prevailed in including the limitation provision, while sometimes compromising on its amount.

Thus for FY 1971, although the amount contemplated by the substantive 1970 Act would have been $280 million, the House

bill provided only $220 million. The Senate Appropriations Committee objected:

> The Committee recommends the deletion of Section 303 of the House bill.
>
> \* \* \* \* \* \*
>
> The language in the House version of the bill would negate the long-term contracting authority which has been provided in the Airport and Airway Development Act (P.L. 91–258).[10]

As the Conference Report reveals, the House prevailed on the principle of an amount less than that contemplated by the 1970 Act, while compromising on the exact figure:

> Amendment No. 33: Restores House provision and limits commitments for grants-in-aid for airport development to $250,-000,000 instead of $220,000,000 as proposed by the House.[11]

The pattern was repeated for FY 1972, when the amount contemplated by the 1970 Act would have been $280 million plus a backlog of $110 million (*see* note 6, *supra*). The House appropriations proposal was described in the House report:

> As in the last year's bill, a limitation on obligations for development grants in fiscal year 1972 is included in the bill. The

---

for the FAA to distribute it to sponsors who are entitled to the funds under the statute. Furthermore, if Congress had intended to put a limitation on yearly expenditures previously authorized, it could have done so straight forwardly through an amendment, rather than changing the statutory funding scheme through an ambiguous section of an appropriations act. In fact, Congress *increased* obligational authority by amending § 1714 in 1973, which indicates that Congress could likewise have *decreased* obligational authority by amendment to the Airport Act.
*Id.* at 556.

**9.** The combination of legislative history and avoidance of "absurd or futile results" would even warrant departure from the "plain meaning." *United States v. American Trucking Associations,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). "To the extent that the Court of Appeals excluded reference to the

legislative history of the FWPCA in discerning its meaning, the court was in error." *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 9–10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976). *See Cass v. United States,* 417 U.S. 72, 77–79, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974).

In the present case, we are able to apply the plain meaning of the language of § 302, for it serves the meaningful objective of limiting the sum of airport development grants made by the FAA in the appropriate year. The fact that this was a departure from what was contemplated when the 1970 Act was passed does not make it "illogical" or absurd.

**10.** S.Rep. No. 1372, 91st Cong., 2d Sess. 11 (1970).

**11.** H.R.Rep. No. 1730, 91st Cong., 2d Sess. 9 (1970). Although H.R. 17755 was not enacted into law, Congress enacted a continuing resolution which permitted operations at the rate it provided, P.L. 91–645, 84 Stat. 1893 (1971).

limitation recommended is $280,000,000.
. . .[12]

The Senate demurred:

> The Committee was informed that the 1972 program level for the airport development program will be $280 million, the minimum annual level authorized (Sec. 14, P.L. 91–258). Section 303 of the House bill sets a limitation at the authorization level on grant-in-aid commitments.
>
> The Committee has recommended deletion of Section 303 of the House bill in order to comply with the provisions of the Airport and Airways Development Act (P.L. 91–258).[13]

The conference committee restored the House provision:

> Amendment No. 37: Restores the House provision limiting commitments for grants-in-aid for airport development to $280,000,000.[14]

This pattern was repeated again in the appropriations process for FY 1973.[15] For FY's 1974 and 1975, the principle had been established and the disagreement was only over the amount of the limitation.[16]

It will be noted that these appropriations reports, on both the House and Senate sides, referred to the figure set in the appropriations bills as *limitations on the grants in aid.* The same reference recurred when Congress subsequently increased the amount for FY 1975 by $25 million.[17] These references undercut the district court's interpretation that the amount was only a limit on the FAA's administrative expense.

■ According to its own rules, Congress is not supposed to use appropriations measures as vehicles for the amendment of general laws, including revision of expenditure authorization.[18] In general, the doctrine disfavoring repeals by implications is said to apply "with full vigor" when the subsequent law is an appropriations meas-

12. H.R.Rep. No. 341, 92 Cong., 1st Sess. 13 (1971).

13. S.Rep. No. 271, 92d Cong., 2d Sess. 12 (1971).

14. H.R.Rep. No. 382, 92d Cong., 2d Sess. 8 (1971).

15. H.R.Rep. No. 1082, 92d Cong., 2d Sess. 17 (1972); S.Rep. No. 865, 92d Cong., 2d Sess. 15 (1972); H.R.Rep. No. 1312, 92d Cong., 2d Sess. 9 (1972).

16. H.R.Rep. No. 285, 93d Cong., 1st Sess. 19 (1973); S.Rep. No. 346, 93d Cong., 1st Sess. 13 (1973); H.R.Rep. No. 426, 93d Cong., 1st Sess. 9 (1973); H.R.Rep. No. 1111, 93d Cong., 2d Sess. 17 (1974).

17. *Notwithstanding the limitation on Grants-in-Aid for Airport Development contained in section 302 of Public Law 93–391,* the $25,000,000 appropriated by Public Law 91–168 for such grants and subsequently transferred to the Airport and Airway Development Fund by Public Law 91–258 shall be available for obligation through June 30, 1975.
P.L. 93–554, 88 Stat. 1779 (1974) (emphasis added). This added $25 million is for the discretionary fund. H.R.Rep. No. 1503, 93d Cong., 2d Sess. 12 (1974). Thus it does not affect the amounts available to satisfy the enplanement allocations.

18. Senate Standing Rule XVI, ¶ 4 (1975) provides:
> No amendment which proposes general legislation shall be received to any general appropriation bill, nor shall any amendment not germane or relevant to the subject matter contained in the bill be received. . . .

House Rule XXI, ¶ 2 (94th Cong. 1976) provides:
> No appropriation shall be reported in any general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law, unless in continuation of appropriations for such public works and objects as are already in progress. Nor shall any provision in any such bill or amendment thereto changing existing law be in order, except such as being germane to the subject matter of the bill shall retrench expenditures by the reduction of the number and salary of the officers of the United States, by the reduction of the compensation of any person paid out of the Treasury of the United States, or by the reduction of amounts of money covered by the bill. . . .

*But see* 110 Cong.Rec. 11391 (1967) and 115 Cong.Rec. 21471 (1969), upholding limitations on the amount and use of funds in appropriations.

ure.[19] Where Congress chooses to do so, however, we are bound to follow Congress's last word on the matter even in an appropriations law. "There can be no doubt that Congress could suspend or repeal the authorization contained in § 9; and it could accomplish its purpose by an amendment to an appropriation bill, or otherwise." *United States v. Dickerson,* 310 U.S. 554, 555, 60 S.Ct. 1034, 1035, 84 L.Ed. 1356 (1940). Courts have treated appropriations measures as amendments in a number of cases.[20]

■ We are of course aware of the impoundment cases.[21] They are not dispositive of this case, however, because this case does not involve independent refusal by the Executive or agency to spend the amounts that Congress has required. Here, the FAA was caught in a statutory squeeze where the later appropriations directive it had to follow prevented it from carrying out the scheme established by the 1970 Act. Congress knew of the backlog of money allocated by the Act which had not been granted to sponsors by the FAA. By the § 302 limitation on granting, Congress froze this

backlog in the Trust Fund, perhaps for later use. This was not executive "impoundment" of the legislative appropriations; it was a congressional reduction—if an impoundment at all, an impoundment by statute.

## IV. REMAINING VITALITY OF THE ACT

We have concluded that the appropriations measures considered in Part III prevented the FAA from making the "minimum" grants provided by the 1970 Act, thereby necessarily modifying the FAA's course in administering the program. We turn to the question of defining the FAA mandate as modified, and build on the premise that as much of the 1970 Act as possible should be retained, consistent with the provisions and purpose of the modifying appropriations.

■ If Congress does not appropriate enough money to meet the needs of a class of beneficiaries prescribed by Congress, and if Congress is silent on how to handle this predicament, the law sensibly allows the

---

**19.** *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S.App.D.C. 380, 382, 463 F.2d 783, 785 (1971); *Hill v. TVA,* 549 F.2d 1064, 1072 (6th Cir. 1977). These cases held that there had been no repeal of a general protective statute (NEPA and the Endangered Species Act) by appropriations for a particular project. However, in *Friends of the Earth v. Armstrong,* 485 F.2d 1, 8–10 (10th Cir. 1973), cert. denied, 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974), the court held that an appropriations prohibition on expenditures overrode earlier congressional intent expressed in a statute governing the use of a particular river, the Colorado River Storage Act.

 *See also Concerned Residents of Buck Hill Falls v. Grant,* 537 F.2d 29, 34–35 (3d Cir. 1976) (subsequent appropriation does not excuse agency's statutory violation).

**20.** *United States v. Dickerson,* 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940), held than an appropriations measure, repeatedly enacted in successive years, which denied funds prospectively for payment of reenlistment allowances, had the effect of suspending the right to the allowances during the affected year. It cites a number of precedents. Post-*Dickerson* precedents include *e. g. Tayloe v. Kjaer,* 84 U.S.App. D.C. 183, 184, 171 F.2d 343, 344 (1948); *Eisen-*

berg v. Corning, 86 U.S.App.D.C. 21, 179 F.2d 275 (1949); *Friends of the Earth v. Armstrong, supra,* note 19 at 9.

 The overall statutory context may, of course, lead to the conclusion in some instances that a mere appropriations omission or subsequent repeal does not undercut vested obligations. *New York Airways, Inc. v. United States,* 369 F.2d 743, 749, 177 Ct.Cl. 800 (1966); *Larionoff v. United States,* 175 U.S.App.D.C. 32, 533 F.2d 1167, 1179–80 (1976), *affd.* —— U.S. ——, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977).

**21.** *Train v. City of New York,* 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975). *E. g., State Highway Comm'n v. Volpe,* 479 F.2d 1099, 1115 (8th Cir. 1973); *Guadamuz v. Ash,* 368 F.Supp. 1233 (D.D.C.1974); *Commonwealth of Pennsylvania v. Weinberger,* 367 F.Supp. 1378 (D.D.C. 1973); *National Council of Mental Health Centers, Inc. v. Weinberger,* 361 F.Supp. 897 (D.D.C.1973). *See* the Impoundment Control Act of 1974, 31 U.S.C. §§ 1400 *et seq.; Commonwealth of Pennsylvania v. Lynn,* 163 U.S.App. D.C. 288, 297–301, 501 F.2d 848, 857–61 (1974), found a program suspension for purposes of reassessment to be valid and in furtherance of the purpose of the act.

administering agency to establish reasonable priorities and classifications.[22]

However, in the case before us, the shortfall of obligational authority in no way prevented the FAA from adhering to the distributional formula in the mandate of the Act.

While we are in agreement with the FAA that the annual appropriations measures subjected it to contraints beyond those in the Act, our agreement does not extend to FAA's response to the statutory squeeze. What the FAA did was to take the constraints as authorizing it to establish a priority system to determine which of the § 1715(a) entitlements to grant to sponsors within the § 302 appropriations limit. The priority system was applied equally to a sponsor's entitlement for the current year and the backlog due under 49 U.S.C. § 1715(a)(3). The priority system involves a numerical rating based on the type of airport, the essentiality of the work, and the timing of the need for the project, but in the last analysis the decision as to which projects to fund was a matter of the FAA's judgment.[23] In this case, although the City of Los Angeles had a project that on its own merits had approval, it was granted only a small portion of its apportionment for FY's 1974–75—$0.95 million of $5.7 million for 1974 and $0.54 million of $5.4 million for 1975.

 We think the FAA acted impermissibly when it used the confrontation and resolution of conflicting statutory mandates on total amounts, as a basis for asserting a new discretion concerning the disbursement of airport development allocations that flew in the face of Congress's unambiguous and uncontradicted demarcation of that discretion. When Congress modifies a statute by an appropriations measure, or any other amendment, the agency administering the statute is required to effectuate the original statutory scheme as much as possible, within the limits of the added constraint. Section 302 only restricted the *amount* the FAA could obligate. Section 302 said not a word about the method of distributing the money available. We hold that the FAA was required to distribute the money available so as to preserve the allocation formula provided by § 1715(a).

The explicit formula of § 1715(a)(1) limits the FAA's discretion to only one-third of the total money available for the development of large airports. Congress not only gave the airports a one-third allocation, but further provided in § 1715(a)(3), that the sponsors' entitlement to their funds allocated under the enplanement formula would continue for two years after the year of initial apportionment. There is an explicit provision for remission to the FAA's discretionary fund—if the funds allocated by the enplanement formula are not used within the 3-year period (the initial year of allocation plus two leeway years). The FAA had no valid basis for reaching out for still more discretionary funds. The legislative history of the Act shows that the ⅔ mandatory, ⅓ discretionary scheme of § 1715(a) was delib-

---

**22.** Having found that the congressional appropriation was intended to cover welfare services at least to those Indians residing "on or near" the reservation, it does not necessarily follow that the Secretary is without power to create reasonable classifications and eligibility requirements in order to allocate the limited funds available to him for this purpose. . . Thus, if there were only enough funds appropriated to provide meaningfully for 10,000 needy Indian beneficiaries and the entire class of eligible beneficiaries numbered 20,000, it would be incumbent upon the BIA to develop an eligibility standard to deal with this problem, and the standard, if rational and proper, might leave some of the class otherwise encom-

passed by the appropriation without benefits. *Morton v. Ruiz,* 415 U.S. 199, 230–31, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974).

**23.** The FAA's annual report to Congress for FY 1974 described the priority system thusly:

Priorities are determined from a numerical rating table through which various factors are weighed, such as work essentiality, NASP code, and timing of need. This process is not purely a mathematical computation, but rather, the exercise of judgmental discretion in the application of these guidelines.

Attachment D to Affidavit of Jess Speckart, May 7, 1975.

erately chosen to serve the policies Congress perceived.[24]

This results, in our view, in a construction whereby the overall amount of the appropriations measure is allocated, pro rata, in accordance with the formula of the Act. It appears from our research that a direction to preserve the allocation formula in the event of an insufficiency of funds was initially proposed by the House,[25] but was not incorporated in the Act as passed, in 1970.

The pro rata reduction we have provided is consistent with the Act's goal of encouraging long term planning with the mandatory enplanement funds. Despite a sponsor's entitlement under the Act, and even after "obligation" by the FAA, actual receipt of the money is contingent on appropriation by Congress. There is an unavoidable contingency which materialized in this instance, that the money a sponsor was counting on would not be fully appropriated. But the uncertainty facing the airport sponsor is less under our pro rata approach, than if the FAA had discretion to withhold apportioned funds virtually in entirety.

## V. REMAND

▇ We remand the case to the district court to determine the percentage reduction to be applied to Los Angeles's $9.6 million enplanement portion. This course is necessitated by the state of the record. Neither party advocated the solution to the statutory puzzle which we find best complies with Congress's intent. They each presented an all-or-nothing approach. Thus we lack the advocacy of the parties, the pertinent facts of the FAA's history of granting enplanement funds, and expert advice available in the government. That expert advice is available not only in the strictly Executive Branch but in the General Accounting Office, for we have in mind that the district court may be well advised to obtain assistance from the Comptroller General's expertise in matters of expenditures, reductions by appropriations, and impoundments.[26]

▇ Section 1714(b), as it was during the time we are called on to judge the FAA's duty, FY 1975, prohibited the FAA from incurring any obligation under that subsection's authorization after June 30, 1975. Relief for Los Angeles is nonetheless possible now under that provision because of the order entered by the district court on June 25, 1975. Having found for the plaintiff, the court ordered the FAA to obligate the full $9.6 million to Los Angeles before the June 30 deadline, subject to modification by the court for any statutory deficiencies in Los Angeles's project.[27] Thus, the district court established jurisdiction over Los Angeles's full entitlement and can proceed to order the payment of the appropriately reduced amount on remand.

We remand the case to the district court to determine, in accordance with this opinion, the method of pro rata reduction the FAA should have used in granting enplanement funds up to the limits set by the appropriations act for FY 1975. The court

---

24. The Senate Report on Pub.L. No. 91–258 stated:

> The apportionment formula provided is for a 10-year period and will assure that 149 hub communities will receive a guaranteed level of airport assistance grants each year providing those communities' project applications are approved. *In addition to that fixed sum,* all air carrier and reliever airports in any State will be eligible for the amount set aside for that State under the one-third portion apportioned to projects in the States. Finally, a hub area may well also receive grant assistance from the Secretary's discretionary account if it has a relatively high priority in the national airport system plan.

S.Rep. No. 565, 91st Cong., 2d Sess. 28 (1969) (emphasis added).

25. *See* H.R.Rep. No. 601, 91st Cong., 1st Sess. 21 (1969).

26. *See* the role given the Comptroller General in the Impoundment Control Act of 1974, 31 U.S.C. §§ 1405 & 1406. *Cf. M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. 221, 237, 455 F.2d 1289, 1305 (1971) (Comptroller General expertise in government procurement); *Wheelabrator Corp. v. Chafee,* 147 U.S.App.D.C. 238, 245, 455 F.2d 1306, 1313 (1971) (primary jurisdiction of the General Accounting Office in procurement bid protests).

27. *City of Los Angeles v. Coleman,* Civ. No. 75–0679, Order at 2 (D.D.C. June 26, 1975), J.A. 283.

shall also apply this method to the facts of FY 1975, including the amount of approvable applications submitted by sponsors with enplanement apportionments and the total obligation of enplanement funds mandated by the Act. The court shall then order the FAA to grant to the City of Los Angeles what it would have gotten if the FAA had been using during FY 1975 the method that, in our view, was mandated by Congress.

*So ordered.*