606 F.2d 290
 WALKER FIELD, COLORADO, PUBLIC AIRPORT AUTHORITY, Plaintiff-Appellant,
v.
Hon. Brock ADAMS, as Secretary of Transportation of the
United States Department of Transportation, Dr. John
McLucas, as Administrator of Federal Aviation
Administration, M. M. Martin, as Director, Rocky Mountain
Region, Federal Aviation Administration, Edward G. Tatum, as
Chief, Denver Airport District Office, Defendants-Appellees.
 No. 77-1586.
 United States Court of Appeals,
Tenth Circuit.
 Argued Aug. 8, 1978.
Decided Sept. 26, 1979.
 
 James Spelman, Grand Junction, Colo., for plaintiff-appellant.
 C. Scott Crabtree, Asst. U. S. Atty., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., on brief), for defendants-appellees.
 J. D. MacFarlane, Atty. Gen., David W. Robbins, Deputy Atty. Gen., Edward G. Donovan, Sol. Gen. and David E. Engdahl, Special Asst. Atty. Gen., Denver, Colo., on brief for the State of Colorado as amicus curiae.
 Before HOLLOWAY, DOYLE and McKAY, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 Plaintiff-appellant Walker Field Public Airport Authority ("Walker Field") brings this appeal from a dismissal of its suit against the Secretary of Transportation and others. The suit challenged the lawfulness of defendants' actions in seeking to require the County of Mesa and the City of Grand Junction, Colorado, to join the Walker Field Authority in assuming obligations for improvement of Walker Field airport for which the Federal Government offered to make a Grant Agreement. The action was dismissed for "failure to state a claim for relief within the jurisdiction of the court."
 
 
 2
 Since the complaint and action were dismissed for such defects in the complaint, we turn to the facts as alleged in that pleading and to a discussion of the general background of the controversy.
 
 
 3
 * The Airport and Airway Development and Revenue Act of 1970, as amended, 49 U.S.C. Secs. 1701-1742 (1976) (the "Act"), provides for the expansion and improvement of the Nation's airport and airway system. Financing for these improvements is largely, although not exclusively,[1] provided by airport and airway user charges imposed by the Act.[2] The charges collected are paid into the Airport and Airway Trust Fund, 49 U.S.C. Sec. 1742(b) (1976), from which they are returned to individual airports under, Inter alia, the terms of project grant agreements, 49 U.S.C. Sec. 1714(a) (1976).
 
 
 4
 The complaint avers that on September 23, 1976, Walker Field, a political subdivision of the State of Colorado formed under the Colorado Public Airport Authority Law, Colo.Rev.Stat. Secs. 41-3-101 41-3-108 (1973), for the purpose of acquiring and improving airports[3] submitted to the Federal Aviation Administration ("FAA")[4] a Project Application for financial assistance under the Act for the construction of fire bays, fencing and a taxiway for the Walker Field airport. The estimated cost of the project was $690,480.00 (I R. 4). No other agency submitted an application.
 
 
 5
 On January 4, 1977, Edward G. Tatum, Chief of the Denver Airport District Office of the FAA transmitted an "Offer" to Walker Field, Mesa County, and the City of Grand Junction as joint sponsors of the proposed project ("joint sponsors"). The "Offer" was made on and subject to, Inter alia, the following condition (I R. 16):
 
 
 6
 16. The FAA in tendering this Grant Offer on behalf of the United States recognizes the existence of a Co-sponsorship Agreement between the City of Grand Junction, Mesa County, and Walker Field, Colorado, Public Airport Authority, entered into between the parties on August 14, 1972. By acceptance of this Grant Offer said parties assume their respective obligations as set forth in said Co-sponsorship Agreement. It is understood and agreed that said agreement will not be amended, modified or terminated without prior written approval of the FAA.
 
 
 7
 On January 10, 1977, Walker Field executed a Grant Acceptance thereby agreeing to all of the terms and conditions which had been added to the Offer. Subsequently on January 17 and 19, respectively, the Board of County Commissioners of Mesa County and the City Council of the City of Grand Junction adopted resolutions, (I R. 18-21), adverting to the Offer, declaring that they had not made application for a grant and declining to assume, on behalf of their citizens, the obligations of sponsorship under the Grant Agreement.
 
 
 8
 Walker Field alleges that between it and defendant there was an agreement constituting an obligation of the United States and of the Sponsor, Walker Field, by the terms of both the Grant Agreement and the Act. (I R. 5). Walker Field has proceeded to carry out its obligations under the agreement, incurring expenses from its own funds and had submitted, up to filing of the complaint, a request for reimbursement in the amount of $12,788.55, and was still continuing with its obligations to complete the project, continuing to incur full expense and requesting reimbursement for the federal share of the project cost owed to Walker Field. (I R. 6).
 
 
 9
 The FAA states that it has delayed reimbursement of the federal share of the project and will continue such delay, pending resolution of the execution question. The defendant has further refused to recognize the existing Grant Agreement by offering to make new grant offers for the same project. (I R. 6).
 
 
 10
 Walker Field's complaint alleged that the conduct of defendants in making the additional sponsors a condition precedent to defendants' performance of the Grant Agreement is contrary to the express procedures of the Act, which requires that a sponsor be an applicant or applicants; that defendants' conduct attempting to enlarge the political enforceability of the representations, obligations, terms and conditions on public agencies not desiring such obligations "is in excess of the defendants' discretion under the said Act and otherwise not in accordance with said law." (I R. 7).
 
 
 11
 Further the complaint claimed that if the Act is construed to permit the defendants to impose such conditions, such power would be in excess of that granted the Federal Government by the Constitution and that such power to manipulate the States and their political subdivisions with respect to authority reserved to them would violate the concept of immunities between the United States and the several States. (Id. at 7).
 
 
 12
 It was alleged that Walker Field is damaged by the delay in reimbursement of the federal share of $12,788.55 to date and would continue to be damaged by defendants' delay in meeting their obligation under the Grant Agreement to pay 90% Of the allowable project costs. (Id. at 7).
 
 
 13
 The complaint prayed for a declaratory judgment that "the Grant Agreement as executed January 10, 1977 is an agreement between the United States and Walker Field, . . . mutually obligating the said parties, and only those parties, to the terms and conditions thereof or incorporated therein . . . " In addition, Walker Field prayed for equitable relief enjoining "the defendants and each of them and their successors, agents and employees from requiring, as a condition of meeting the United States obligations under the said Grant Agreement, representations, assurances, terms or conditions of any other public agency than . . . Walker Field . . . unless such other public Agency desire to give such representations, assurances, obligations, terms or conditions." (I R. 8).
 
 
 14
 The Government moved to dismiss for lack of jurisdiction and the trial court held a hearing on that motion. At the conclusion of the hearing the trial judge granted the motion, stating that he was convinced "that there is no basis for claims for relief within the jurisdiction of this Court." (II R. 18). More specifically the court said that to the extent that the remedy for breach of contract is damages, the damages are greater than the limitation in the Tucker Act and the issue has to be in the Court of Claims;[5] that the Secretary's imposition of the requirement that the City of Grand Junction and Mesa County also assume obligations, along with Walker Field, as set forth in the earlier co-sponsorship agreement was well within the Secretary's authority and discretion in prescribing the terms and conditions of the grant; and that therefore there was no basis for claims for relief within the jurisdiction of the court. (II R. 16-18).
 
 
 15
 The trial court's formal order of dismissal similarly stated that "this complaint and civil action are dismissed for the failure to state a claim for relief within the jurisdiction of this court." This appeal followed.
 
 II
 
 16
 First, we turn to the trial court's reasoning that "(o)bviously the damages here are greater than the limitations imposed on this court by the Tucker Act . . . and this issue has to be in the Court of Claims." (II R. 16).
 
 
 17
 We must, of course, follow the rule that a complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80. Thus we feel it was correct for the district court to analyze the complaint from different perspectives, as was done.
 
 
 18
 At the outset, it is clear that a contract a "Grant Agreement" was alleged as was the claim that the plaintiff Walker Field was damaged by the delay in reimbursement of the federal share of $12,788.55. These allegations could serve as a basis for attempting proof of actual damages for breach of contract by Walker Field. Such a case would come within 28 U.S.C. Sec. 1491 as a "claim against the United States founded . . . upon any express or implied contract with the United States . . . " and hence within jurisdiction of the Court of Claims. And such jurisdiction would be exclusive because as such a claim the complaint would also run afoul of the limitation on the concurrent jurisdiction of the district court in contract claims against the United States. 28 U.S.C. Sec. 1346(a)(2) provides that the district courts have jurisdiction Inter alia, of any "civil action or claim against the United States, Not exceeding $10,000 in amount, founded . . . upon any express or implied contract with the United States . . . " (Emphasis added).
 
 
 19
 Thus as such a contract claim against the United States for damages over $10,000, we must agree with the trial judge that the Court of Claims has exclusive jurisdiction. See International Engineering Co., Division of A-T-O, Inc. v. Richardson, 512 F.2d 573, 577 (D.C.Cir.), Cert. denied, 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636.
 
 III
 
 20
 The trial court also analyzed the complaint from other viewpoints as was proper under Conley v. Gibson, supra, before dismissal of a complaint. This analysis was particularly necessary because the complaint clearly claimed jurisdiction under 28 U.S.C. Sec. 1331(a); it sought to allege a case arising under the Airport and Airway Development Act of 1970; and it claimed violation of the reservation of powers to the States and the constitutional concept of immunities between the United States and the several States. Furthermore the complaint averred that the defendants' acts were "in excess of the defendants discretion under the said Act and otherwise not in accordance with said law" which would reasonably come within the terms of 5 U.S.C. Sec. 706(2)(A) for review under the Administrative Procedure Act.[6] In short, the claims made required further consideration of possible jurisdiction of the case under 28 U.S.C. Sec. 1331(a) as one which "arises under the Constitution, laws, or treaties of the United States."
 
 
 21
 We feel that the claims of violation of terms of the Airport and Airway Development Act and of abuse of discretion by the defendants are closely related and we will consider them together for our purposes. From the face of the complaint and its exhibits it appears that the defendants submitted an Offer on January 4, 1977 addressed to the sponsoring plaintiff but also addressed to the non-sponsoring entities, the County of Mesa and the City of Grand Junction (I R. 5). Further it is averred that the "defendant persists in attempting to secure obligation of the said project by the County of Mesa, Colorado and the City of Grand Junction, Colorado by insisting upon either execution of grant Offer, (thereby assuming all representations, assurances, obligations and terms and conditions), or have the said County and City give to the defendant separate assurances that they will insure the performance of all the said representations, assurances, obligations and terms and conditions of any ADAP project." (Id. at 6). As noted in Part I, Supra, the defendants' offer in paragraph 16 recognized the existence of a 1972 co-sponsorship agreement between the City, the County and Walker Field and conditioned the acceptance on the offer of the grant agreement to the assumption by the three entities of their respective obligations in that agreement. (I R. 16).
 
 
 22
 Further it was alleged that defendant is delaying payment of reimbursement of the federal share of the project costs, owed as defendant's obligation, to enforce the obtaining of the additional representations and assurances, and that defendant will continue such delay until the question of execution of the agreement is settled. (Id. at 6).
 
 
 23
 Walker Field relies on City of Los Angeles v. Adams, 181 U.S.App.D.C. 163, 556 F.2d 40 (D.C.Cir.) and State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (8th Cir.), arguing that the trial court erred in failing to recognize the existence of the Grant Agreement executed by Walker Field which defendant submitted, and that there was a limitation on defendants' discretion in that requiring such non-owners or operators as the City and County to assume the obligations was creating a new discretion on selecting sponsors beyond the authority conferred by the Act and contrary to defendants' regulations which made co-sponsorship a matter of "desire." (See 14 C.F.R. Sec. 152.39) (Brief of the Appellant 22, 26-27).
 
 
 24
 Walker Field points to 49 U.S.C. Sec. 1711(18) which defines a sponsor as follows:
 
 
 25
 (18) "Sponsor" means any public agency which, either individually or jointly with one or more other public agencies, submits to the Secretary, in accordance with this subchapter, an application for financial assistance.
 
 
 26
 And Walker Field relies also on 49 U.S.C. Sec. 1719 which provides in part that
 
 
 27
 Upon approving a project application for airport development, the Secretary, on behalf of the United States, shall transmit to the sponsor or sponsors of the project application an offer to make a grant for the United States share of allowable project costs. An offer shall be made upon such terms and conditions as the Secretary considers necessary to meet the requirements of this subchapter and the regulations prescribed thereunder. Each offer shall state a definite amount as the maximum obligation of the United States payable from funds authorized by this subchapter, and shall stipulate the obligations to be assumed by the sponsor or sponsors.
 
 
 28
 If and when an offer is accepted in writing by the sponsor, the offer and acceptance shall comprise an agreement constituting an obligation of the United States and of the sponsor.
 
 
 29
 From these provisions Walker Field argues that the statute contemplates that a "sponsor" is an entity willing to apply, that an offer by the Secretary is to be made only to such an applicant, and that when Walker Field itself accepted the offer, there was an agreement.
 
 
 30
 First, we cannot agree with Walker Field's argument that the trial court failed to recognize the existence of the Grant Agreement. The argument begs the question. If the Secretary had authority to make the offer with the conditions imposed, and which were not accepted by the City and County, then there was no contract accomplished by mere approval of the Walker Field Authority. Since we conclude the conditions were lawfully imposed, the argument fails.
 
 
 31
 Second, we must agree with the trial court that the defendants' actions were within authority granted by the Act. Within 49 U.S.C. Sec. 1719 there is the provision quoted above that an offer shall be made by the Secretary "upon such terms and conditions as the Secretary considers necessary to meet the requirements of this subchapter and the regulations . . . " And 49 U.S.C. Sec. 1718 states in part that
 
 
 32
 To insure compliance with this section, the Secretary shall prescribe such project sponsorship requirements, consistent with the terms of this subchapter, as he considers necessary. Among other steps to insure such compliance the Secretary is authorized to enter into contracts with public agencies, on behalf of the United States.
 
 
 33
 Further there are pointed provisions dealing with the Secretary's obligation to be satisfied about the sufficiency of funds for the portion of expense not to be borne by the Federal Government and the project's completion without undue delay. See 49 U.S.C. Sec. 1716(c)(1)(B) and (1)(C). Walker Field vigorously denies that there is any factual basis for such concerns or that they justify the demand for the obligations of the City and County. There is, however, a broad discretion conferred on the Secretary. The relationship of the City and County to Walker Field is apparent since the City and County created the Walker Field Authority by their combined action. See Enger v. Walker Field, Colorado, Public Airport Authority, 181 Colo. 253, 508 P.2d 1245, 1246 (Colo.). We cannot say that calling for the additional obligations by the City and County were beyond the reasonable limits of the Secretary's discretion or an abuse of such discretion.
 
 
 34
 We do not agree that City of Los Angeles v. Adams, 181 U.S.App.D.C. 163, 556 F.2d 40 (D.C.Cir.), supports Walker Field here. The opinion does reject the FAA's effort to exercise a "new discretion" which the court found to be beyond its statutory authority. Id. at 50. However, the court's reasoning was that there is a mandatory formula of apportionment to airports under Sec. 1715(a) of the Act and that a shortfall in appropriations did not justify the FAA in totally abandoning that formula and devising a new priority system of its own. In the instant case we find no such mandatory directive and instead feel that the defendants' imposition of terms and conditions was within the discretion confided to the Secretary.
 
 
 35
 Likewise we find that State Highway Commission of Missouri v. Volpe, 479 F.2d 1099 (8th Cir.) does not lend support to Walker Field. The court there held an exercise of discretion to withhold highway funds provided under specific formulas for reasons of the status of the economy and control of inflationary pressures reasons "remote and unrelated to the Act . . . " (Id. at 1114) to be impermissible. On the contrary the defendants' actions here were within the area of discretion given the Secretary.
 
 
 36
 Thus we are convinced that the defendants' actions challenged here were within their statutory authority and not contrary to the Act or the regulations, and that there was no abuse of discretion.[7]
 
 
 37
 Third, we will consider constitutional arguments pressed by Walker Field and the State of Colorado as amicus based on National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245. In essence it is argued that if there is such discretion to compel the County of Mesa and the City of Grand Junction to join as co-sponsors for the project, then such discretion would be contrary to the Tenth Amendment's provision that powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States or to the people. More specifically the amicus argues that the challenged actions of defendants violate the constitutional doctrine of intergovernmental immunities, that it was the State's policy in the Public Airport Authority Act, C.R.S.1973, 41-3-102, to finance and operate airport facilities on a self-paying basis "without the incurrence of an indebtedness by the State of Colorado, or by any of its (other) political subdivisions . . . ", and that the Secretary has no power to negate that State policy by forcing a City and County to co-sponsor an airport authority program. (Brief of the State of Colorado as Amicus Curiae, 10-11).
 
 
 38
 We do not agree. Unless barred by some controlling constitutional prohibition, the Federal Government may impose the terms and conditions upon which its money allotments to the States shall be disbursed and any state law or regulation inconsistent with the federal terms and conditions is to that extent invalid. See King v. Smith, 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 20 L.Ed.2d 1118; Stiner v. Califano, 438 F.Supp. 796, 800 (W.D.Okl.). We feel that the terms and conditions imposed here do not " . . . operate to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions." National League of Cities v. Usery,426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245; City of Macon v. Marshall, 439 F.Supp. 1209, 1216-17 (M.D.Ga.); Stiner v. Califano, supra, 438 F.Supp. at 800 n. 4. Since there are no direct, mandatory terms and conditions imposed, and since the State and its agencies can avoid completely the structuring of their relationships or assuming the obligations stipulated by the Secretary by declining the grants, we feel that there is no violation of the constitutional limitation relied on. See City of Macon v. Marshall,supra, 439 F.Supp. at 1217. It may be that some conditions imposed under the spending power of Congress would exceed constitutional limits, but we see no such violation here. Thus we are not convinced that the constitutional arguments or National League of Cities demonstrate any invalidity in the Secretary's actions.
 
 
 39
 In sum, we agree with the conclusions reached by the trial court for the reasons stated. The remaining arguments of Walker Field and the amicus have been considered but they require no further discussion. Considering all the claims of error, we must hold that the ruling of the trial court was correct and its judgment is affirmed.
 
 McKAY, Circuit Judge, dissenting:
 
 40
 Had it Required the City of Grand Junction and the County of Mesa to incur financial risks for an airport project, Congress would clearly have operated to "directly displace the States' freedom to structure integral operations in areas of traditional governmental functions." National League of Cities v. Usery, 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976). City and county funds would necessarily have been diverted from other essential governmental activities, an effect expressly condemned in National League of Cities. Id. at 846, 96 S.Ct. 2465. Even more starkly, the congressional mandate would have operated on the very structure of the state's subdivisions requiring union in a continuing Co-Partnership Agreement and would have imposed financial obligations directly contrary to an express Colorado policy. It would, that is, have "displace(d) state policies regarding the manner in which (the States) will structure delivery of those governmental services which their citizens require," Id. at 847, 96 S.Ct. at 2472, and have impaired Colorado's "ability to function effectively in a federal system." Id. at 852, 96 S.Ct. at 2474, Quoting Fry v. United States, 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975).
 
 
 41
 National League of Cities was of course dealing with federally mandated programs, and by footnote reserved to another day an express reexamination of the limits, if any, on federal stipulations appended to the exercise of spending power. 426 U.S. at 852 n.17, 96 S.Ct. 2465. This court's citations to the spending power cases in distinguishing the instant case from National League of Cities is flawless as those cases appear to read. But the cases themselves suggest that these broad principles and sweeping language do not imply unlimited license to effect federal will through use of the spending power. Those cases stand today in essentially the same posture as the Commerce Clause cases before National League of Cities was decided. While certainly not a license to disregard prior authority, the Supreme Court's footnote does suggest that a logical reexamination of the spending power cases is not precluded. At the very least, National League of Cities suggests that we should be watchful for "whatever may be the limits of (the power to fix the terms on which money allotments may be disbursed to the states)." Lau v. Nichols, 414 U.S. 563, 569, 94 S.Ct. 786, 789, 39 L.Ed.2d 1 (1974). Taking that cue, I do not believe that the sweeping import of the cited cases can be sustained anymore than was Maryland v. Wirtz, 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968), the eight year old case overturned in National League of Cities. 426 U.S. at 853-55, 96 S.Ct. 2465. Since it is clear that the federally mandated alteration of state government function in this case is precisely the kind condemned in National League of Cities, the principal logical distinction between the cases, if any, must be bottomed on the fiction that the spending power cases involve a freedom of choice which is not available under the mandated programs condemned in National League of Cities. The time has long since passed when the mere formality of choice should satisfy constitutional requirements.
 
 
 42
 This court should not ignore the practical financial needs of present day state governments. Those needs may well have ended the freedom of choice once inherent in such conditional grants.[1] Few, if any, states or state subdivisions can now supply adequate services without the benefit of federal largesse. The possibility of refusing federal grants is often only apparent, not real. Particularly after a state has poured significant funding into a program or facility (E. g., the erection of an airport) and attendant local expectations have grown, the state can hardly decline the federal aid necessary to maintain and improve that facility. When grants have risen to this level of necessity, attached conditions must withstand close constitutional scrutiny similar to that applied in National League of Cities to direct regulation of state governmental structure. The federally imposed requirements here fail to survive that scrutiny.
 
 
 43
 The Supreme Court has repeatedly expressed its concern with preserving the "essentials of state sovereignty," National League of Cities, 426 U.S. at 855, 96 S.Ct. 2465, Quoting Maryland v. Wirtz, 392 U.S. 183, 205, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) (Douglas, J., dissenting), a concern this court should not minimize. That concern has been manifested in a broad range of cases, which go far beyond direct regulation, the Commerce Clause, and the other particular issues of National League of Cities. See, E. g., Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).
 
 
 44
 The Civil War Amendments were designed to insure that states are subject to federal power insofar as they fail to provide the protections of individual liberty mandated by the Bill of Rights. To that degree the prior understanding of federalism was modified by subsequent amendments. However, the concept of diversified power, as a check on the loss of individual liberty that would be inherent in one central government of unlimited power, remains vigorous. The essence of that constitutional concept is that there must be institutional encumbrances on government intrusion into individual liberty as well as restraints on direct and discrete intrusions. These constitutional concerns about restraints on governmental power through institutional structure are grounded not only in the Tenth Amendment but also in the "structural assumptions of the Constitution as a whole." L. Tribe, American Constitutional Law 301 (1978).[2]
 
 
 45
 Indeed, the cases cited in the majority opinion do not themselves mandate unlimited exercise of federal spending power. At no time has the Supreme Court suggested that Any federal government exercise of any constitutional power is immune from the constraints of other constitutional provisions. See, E. g., Lau v. Nichols, 414 U.S. 563, 569, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); Ivanhoe Irrigation Dist. v. McCracken, 357 U.S. 275, 295, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958) (conditions must be "reasonable"); King v. Smith, 392 U.S. 309, 333 n.34, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) ("unless based on some controlling constitutional prohibition").[3] The requirements of federalism provide such constraints, even when Congress is exercising powers that are otherwise plenary. National League of Cities v. Usery, 426 U.S. at 842, 96 S.Ct. 2465.
 
 
 46
 This is not to suggest that the concept of federalism proscribes all conditions which might be attached to spending power legislation, even some conditions which might run afoul of National League of Cities broadly construed. As the concept immunizes the states from some federal intrusion, so the spending power itself obligates responsible disbursal of funds collected through federal power. It is inevitable that the states' desires to be immunized from federal stipulations will conflict with the responsible exercise of the spending power. Where those two constitutional concepts come into conflict some balancing must be employed. Such a conflict exists in the instant case. The duty of Congress to insure solvent management of the federal funds might require the states to make financial or governmental structural alterations which strictly speaking would run afoul of the standards set in National League of Cities. It is not suggested that Congress may not require some assurance of financially responsible participation by local units seeking federal tax collecting benefits. However, the concepts of institutional integrity embodied in the federal structure and so strongly reaffirmed in National League of Cities are sufficiently important to require, at a minimum, that the federal program employ the least intrusive method which will satisfy its responsible spending duties and that the stipulation be relevant to the primary purpose of the spending proposal. If the spending power is not confined in such a manner, then National League of Cities would become a silly and useless exercise.[4] In this case no alternatives were offered. The state was given no opportunity to propose viable alternatives, but rather the Secretary's designee indulged in precisely the kind of rigid mandate employed in National League of Cities sans the fictitious opportunity to reject the financial enticement.
 
 
 47
 Our recent satisfactory encounters with federal leadership in the area of explicit constitutional guarantees of individual liberties may well have beguiled us into subordinating in our minds the significance of the individual protection embodied in a division of authority. This case presents a prime opportunity to examine the scope, restraints and divisions of the exercise of power among constitutionally acknowledged institutions of government. The exercise of federal power in this case goes beyond the scope of its properly delegated authority and offends the restraints embodied in the concept of federalism. The result of effectively implementing the restraints embodied in that concept well may be a determination by Congress to forgo major spending projects if prohibited from imposing some favored but unconstitutional conditions. That, of course, would be the intended fruit of federalism, a restraint on the arrogation of federal power to the unreasonable detriment of state viability. This case should be reversed.
 
 
 
 [1]
 Some monies in the Airport and Airway Trust Fund have come from general appropriations, 49 U.S.C. Sec. 1742(d); See (1970) U.S.Code Cong. & Admin.News, p. 3085, especially during the early years of the Fund when it was not expected to be self-sustaining. Although user charges are paid into the Fund, they are not available for distribution until they are appropriated by Congress, 49 U.S.C. Sec. 1714(f)(2) (1976); See, e. g., (1970) U.S.Code Cong. & Admin.News, p. 3095
 
 
 [2]
 User charges incorporated in the price of commercial plane tickets are federal, and they preempt the field. See 49 U.S.C. Sec. 1513 (1976), enacted in response to Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc., 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620; Allegheny Airlines, Inc. v. City of Philadelphia, 309 A.2d 157 (Pa.)
 
 
 [3]
 Under the provisions of Colo.Rev.Stat. Sec. 41-3-104 (1973), Walker Field was created by Mesa County, Colorado and the City of Grand Junction, Colorado. Walker Field is the sole owner and operator of the public airfield facilities of Walker Field Airport
 
 
 [4]
 The Secretary of Transportation, pursuant to statutory authority, 49 U.S.C. Sec. 1727 (1976), has delegated the functions vested in him by the Act to the Administrator of the FAA, 49 C.F.R. Sec. 1.47(f) (1977). See Citizens Airport Committee of Chesterfield County v. Volpe, 351 F.Supp. 52, 59 (E.D.Va.)
 
 
 [5]
 28 U.S.C. Sec. 1346(a)(2) confers original jurisdiction on the federal district courts, concurrent with the Court of Claims, of:
 (2) Any other civil action or claim against the United States, Not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or Upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort, . . . (Emphasis added).
 
 
 [6]
 Such review under the Administrative Procedure Act could be sought although in such a case jurisdiction must be proper under the jurisdictional grant of 28 U.S.C. Sec. 1331. See Califano v. Sanders, 430 U.S. 99, 107, 97 S.Ct. 980, 51 L.Ed.2d 192
 
 
 [7]
 In its Reply to Appellees' Supplemental Brief at p. 6, Walker Field reserved the right to respond to certain factual assertions made in Appellees' Supplemental Brief if they should be developed in the answer or at trial. Walker Field also reserved the right to further amend the complaint to include "allegations of arbitrariness under the Administrative Procedure Act," Inter alia
 Treating these statements as a motion to this court for leave to amend, See Cohen v. Illinois Institute of Technology, 581 F.2d 658, 662 (7th Cir.), Cert. denied, 439 U.S. 1135, 99 S.Ct. 1058, 59 L.Ed.2d 97, we deny the request. We feel that in essence the claim of arbitrariness and abuse of discretion was considered by the trial court and rejected. The trial judge referred to a "real issue" which the case could present if there were amendments to the pleadings, specifying that the Secretary's actions were "beyond his authority or in abuse of his discretion." (II R. 17). After discussing the facts further the trial court said that the requirements imposed were "well within the discretion . . . "; that it was for the Secretary to decide the terms and conditions of the grants and who is to receive money and the obligation on the grants; and that making the parties go along with a previous co-sponsorship arrangement was "within the Secretary's authority." (Id. at 18). We feel the record shows consideration of the claim of abuse of discretion and we agree with the trial court's ruling that there was no abuse of discretion.
 
 
 [1]
 The inherent coerciveness of funding was recognized by the Supreme Court in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477 (1936): "The power to confer or withhold unlimited benefits is the power to coerce or destroy." Id. at 71, 56 S.Ct. at 321. Even in dissent, Mr. Justice Stone saw the possibility of economic force: "Threat of loss, not hope of gain, is the essence of economic coercion." Id. at 81, 56 S.Ct. at 326. Given that the Airport and Airway Trust Fund monies were already appropriated for airport improvements and that the state subdivisions had become dependent on the airport's existence, Colorado faced something approaching a threat of loss. Although much of Butler was effectively repudiated in Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937), even there Mr. Justice Cardozo did not deny the possibility that economic inducement may, at some point, turn into coercion. Id. at 590, 57 S.Ct. 883
 
 
 [2]
 The framers of the Constitution, of course, remain the primary exponents of federalism's virtues:
 In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself.
 The Federalist No. 51 (J. Madison).
 I am unable to conceive that the State legislatures, which must feel so many means of counteracting the federal legislatures, would fail to detect or to defeat a conspiracy of the latter against their common constituents. . . . I must pronounce the liberties of America cannot be unsafe in the number of hands proposed by the federal Constitution.
 The Federalist No. 55 (J. Madison).
 
 
 [3]
 "In a long line of decisions involving a variety of protected rights, the Supreme Court has held that government may not condition the receipt of its benefits upon the nonassertion of constitutional rights." Note, Academic Freedom and Federal Regulation of University Hiring, 92 Harv.L.Rev. 879, 891-92 (1979). With respect to individual rights, for example, the Court abolished the once preeminent "right-privilege" distinction, under which government could "set aside the personal liberties of those with whom it contracted." No longer, that is, can government "trammel( ) an otherwise sheltered constitutional right" by the use of an indirect means. Van Alstyne, Cracks in "The New Property" : Adjudicative Due Process in the Administrative State, 62 Cornell L.Rev. 445, 445-46 (1977)
 
 
 [4]
 One need be only a casual reader of the newspaper to recognize that Congress could attach the very requirements struck down in National League of Cities to a revenue-sharing bill in order to render all that that case stands for a practical nullity