April 19, 1979

## 79-27    MEMORANDUM OPINION FOR THE ACTING LEGAL ADVISER DEPARTMENT OF STATE

### Foreign Service—Retirement—Amount of Annuity (22 U.S.C. § 1076)

Assistant Attorney General Harmon has asked me to respond to your request for our opinion regarding the proper construction of certain statutory provisions relating to the Foreign Service Retirement and Disability System.

Congress, by § 406 of Pub. L. N. 95–426, approved October 7, 1978, 92 Stat. 979, liberalized retirement provisions for certain Foreign Service personnel. Section 821(a) of the Foreign Service Act of 1946, 22 U.S.C. § 1076(a), provides that one of the factors in computing the amount of an annuity under the Foreign Service Retirement and Disability System (Retirement System) is the annuitant's "average basic salary for his highest three consecutive years of service." Section 406 allowed any participant in the Retirement System whose salary was limited by 5 U.S.C. § 5308 to compute his or her annuity based on his or her highest single annual salary instead of the average 3-year formula.[1] This benefit was to accrue only to eligible persons retiring between October 1, 1978, and December 31, 1979. In simple terms, § 406 permitted those whose annual salaries were frozen at $47,500 to retire after 1 year at that salary level, and to have that amount factored into the annuity formula as if they had served 3 years at that level. The stated and obvious purpose of § 406 was to induce early retirement among senior Foreign Service personnel during the operative period of the provision.[2]

---

[1] Section 5308 limits the Federal pay-comparability system (5 U.S.C. §§ 5301–5308) to the basic rate of pay for level V of the Executive Schedule, which at all relevant times was $47,500.

[2] The House International Relations Committee, in H. Rept. 1160, p. 29, 95th Cong., 2d Sess. (1978), stated that, "It is hoped that this temporary annuity provision will help alleviate the overcrowding in the Foreign Service * * *." *See also* H. Conf. Rept. 1535, 95th Cong., 2d Sess., at 52–53 (1978).

However, immediately after Pub. L. No. 95–426 was reported out of conference, Congress reconsidered the wisdom of § 406 and set the legislative machinery in motion to stop it from becoming operative.[3] One effort took the form of an appropriation restriction passed as part of Pub. L. No. 95–481, approved October 18, 1978. The other effort, in more conventional terms, was a simple repeal of § 406, which was included in Pub. L. No. 95–482, approved October 18, 1978. We understand that during the 11-day period § 406 was in effect, 64 persons retired who were eligible to receive the liberalized retirement benefits.

It is clear that persons retiring after October 18, 1978, cannot take advantage of § 406. The question is whether the 64 retirees are entitled to the "high one" benefit of § 406. For the reasons that follow we believe that they are.

## I.

Public Law 95–426 is the Foreign Relations Authorization Act for fiscal year 1979. As stated above, § 406 was intended as an early retirement inducement for certain Foreign Service personnel. The House International Relations Committee in H. Rept. 1160, 95th Cong., 2d Sess. (1978), explained § 406 and the reasons leading to its enactment as follows:

[It] provides a special retirement annuity for those Foreign Service officers and other participants in the Foreign Service retirement system who retire between October 1, 1978 and December 31, 1979 equal to 2 percent of the basic salary for the highest single year of service multiplied by the number of years of service credit obtained. Current law computes annuities on the basis of the highest three years of service.

The committee wishes to note that this provision is not intended to be a precedent for Federal employees generally or for Foreign Service personnel other than those to whom this section applies. The problems which gave rise to this solution are unique to the Foreign Service. It is hoped that this temporary annuity provision will help alleviate the overcrowding in the Foreign Service which has been caused by the President's personnel ceiling and the 1977 District Court decision in *Bradley* v. *Vance* holding the mandatory retirement age for Foreign Service officers unconstitutional.[4]

The conference report, H. Rept. 95–1535, elaborated on this explanation as follows (p. 53):

The civil service system has authority for both reduction-in-force and early retirement inducements to handle similar personnel problems. Temporary and specific retirement inducements are

---

[3] The legislative history of Congress' reaction to § 406 is set forth more fully *infra*.

[4] The District Court opinion in *Bradley* v. *Vance* 436 F. Supp. 134 (D.D.C. 1977) (*per curiam*), was reversed by the Supreme Court. *Vance* v. *Bradley*, 440 U.S. 93 (1979).

used in civil service-staffed agencies when such agencies face difficult personnel problems such as that now confronting the Foreign Service.

This section [§ 406] is necessitated by the separate personnel system of the Foreign Service which has neither reduction-in-force nor special retirement inducement authority.

The Administration voiced strong opposition to § 406, asserting that it would set an unacceptable precedent for other retirement systems and contribute to inflation. It was also claimed that § 406 would frustrate the Administration's pending effort to freeze executive pay by compensating for the freeze with higher annuities.[5] The President, however, approved Pub. L. No. 95–426 despite his strong opposition to § 406's "high one" retirement benefit. In his signing statement he stated that he did so because Pub. L. No. 95–426 authorized "urgently needed appropriations" for the Department of State, the International Communication Agency, and the Board of International Broadcasting. 14 Weekly Comp. of Pres. Doc. 1734–1735.

## II.

Shortly after § 406 became law, two separate provisions were enacted: one to prohibit the expenditure of appropriated funds for § 406 purposes (Pub. L. No. 95–481), and the other to repeal it (Pub. L. No. 95–482). These provisions raise the question whether those Foreign Service personnel who retired after § 406 was passed but before these provisions came into effect are entitled to receive the liberalized retirement benefits of § 406. More precisely, the issue is whether these provisions should be construed to apply prospectively, *i.e.,* so as not to divest those who timely took advantage of § 406's "high one" benefit, or whether they should be given retrospective effect. The general rule concerning such an issue was dealt with in *Greene* v. *United States*, 376 U.S. 149 (1964). There the Court quoted with approval (*id.,* at 160) from *Union Pac. R. Co.* v. *Laramie Stock Yards Co.,* 231 U.S. 190, 199 (1913):

* * * the first rule of construction is that legislation must be considered as addressed to the future, not to the past * * * [and] a retrospective operation will not be given to a statute which interferes with antecedent rights * * * unless such be the unequivocal and inflexible import of the terms, and the manifest intention of the legislature.

---

[5] These views are set forth in a June 26, 1978, letter from Secretary of State Vance and in a July 18, 1978, letter from the Director of the Office of Management and Budget, both addressed to the Chairman of the Senate Foreign Relations Committee. The letters are printed at 124 CONGRESSIONAL RECORD S15725 (daily ed. Sept. 21, 1978), and in S. Rept. 1194, 95th Cong., 2d Sess., at 75–77 (1978), on the 1979 Foreign Assistance and Related Programs Appropriation bill.

The presumption against retrospectivity is designed to protect reasonable reliance on prior settled law. At bottom, the rule is basically one of fairness. Prospective construction is also presumed because retrospective application in some cases would raise serious constitutional issues and courts will not lightly infer a congressional intent fraught with such difficulties. *United States* v. *Larionoff,* 431 U.S. 864, 879 (1977). We believe that retrospective construction in this case would present a constitutional problem. We need not resolve it here because we conclude that Congress did not intend a retrospective repeal of § 406.

## III.

As we have already noted, even before § 406 became law, Congress was moving on two fronts to negate it. One such effort was enacted as part of Pub. L. No. 95–481. We deal with that effort below.

Congress in the 1979 Foreign Assistance and Related Programs Appropriations Act, Pub. L. No. 95–481, appropriated funds to the Foreign Service Retirement and Disability Fund. However, this appropriation provided (92 Stat. 1592):

> That none of these funds or other funds available to the Foreign Service Retirement and Disability Fund shall be available to carry out the provisions of section 406 of the Foreign Relations Authorization Act, Fiscal Year 1979.

The appropriation restriction, literally read, would preclude funding for any payments made pursuant to § 406's "high one" provision. This, in effect, constitutes a repeal with retroactive effect, at least for fiscal year 1979, of § 406's benefit. However, the restriction, despite its seemingly plain language, was intended to be no more than a simple 1-year repeal of § 406. The general rule against retrospective construction thus requires that this action, absent a clear congressional intent to the contrary, apply only prospectively.

The Supreme Court has recently stated that however clear statutory language may appear, resort to the statute's legislative history to discern Congress' intent is proper. *Train* v. *Colorado Pub. Int. Research Group,* 426 U.S. 1, 10 (1976). The legislative history of the appropriation restriction demonstrates, in our view, that it was, no doubt, intended as a repealing provision but that the language was used because the restriction's sponsors seemed to believe that to employ more conventional repealing language would undermine the conference report and delay the urgently needed authorization bill. Senator Inouye, the restriction's sponsor, explained this as follows (124 CONGRESSIONAL RECORD S15725):

> [I]t might be said that the most logical and direct challenge to [§ 406] would have been a move to reject the conference report, which was adopted yesterday by the Senate, but that would have necessitated a reconvening of the conference and a further delay on an already too-long delayed authorization bill. Therefore, in the effort to focus direct attention on the "high-one" retirement,

the [Senate Appropriations] committee chose another route readily available to it, which was to restrict the funding of this Foreign Service retirement fund.

It seems plain that Senator Inouye urged the restriction route in order to accomplish the same result as a direct repeal. Other legislative history supports this view. In the House, Representative Fascell stated that the restriction was intended "to repeal [§ 406] of the authorizing act." 124 CONGRESSIONAL RECORD H12629 (daily ed. Oct. 12, 1978). The term "repeal" was used repeatedly to refer to the restriction. *Id.* Viewing the restriction as a simple repeal, the general rule against retrospective construction should apply. That is, unless Congress manifestly intends retrospective repeal, a repeal should apply only prospectively. Here, no such intent was expressed. Indeed, there is no indication that Congress specifically concerned itself with this aspect of the matter.

Although it is true that the legislative history referred to persons whose § 406 entitlement had vested, these references do not take on the color of a manifest intention that they would be divested of their entitlements. Representative Buchanan, in opposing the restriction, stated (124 CONGRESSIONAL RECORD H12628):

> But let us look for a moment to see whether this amendment will accomplish what the Senate intends. The retirement provision is law, the President signed it. It is an entitlement. Thus those planning to take advantage of this provision—and it is my understanding that 45 individuals have already done so—could, and no doubt would, take the United States to court to obtain the money to which they are entitled.

Representative Fascell stated (124 CONGRESSIONAL RECORD H12629):

> [The appropriation restriction] has the direct legal effect of simply complicating an issue which has already taken place and *upon which people have relied.* The proper process would be to submit a direct repealer or some other modification of the issue in a proper legislative vehicle. [Emphasis added.]

By these remarks, the speakers in arguing against the restriction expressed doubt as to whether it would have any legal effect. Of course, this doubt was unfounded since it is well settled that Congress, where it clearly intends to do so, can in an appropriation act suspend, repeal, or otherwise amend a statute. *See, United States* v. *Dickerson*, 310 U.S. 554, 555 (1940); *City of Los Angeles* v. *Adams*, 556 F. 2d 40, 48–49 (D.C. Cir. 1977).[6]

Section 109 of Pub. L. No. 95–482, the Continuing Appropriations Act for Fiscal Year 1979, reads as follows: "Section 406 of Public Law 95–426 is repealed." But we find no legislative history suggesting that § 109 was

---

[6] We do not mean to say that every appropriation restriction must be applied only prospectively. However, we stress that in this case the restriction was intended to function only as a repeal.

intended to have retrospective effect. *See* 124 CONGRESSIONAL RECORD 18862 for the brief Senate consideration. There was no debate in the House.

We also note that retrospective application of § 406's repeal by Pub. L. No. 95–482 or retrospective application of the appropriation restriction in Pub. L. No. 95–481 would result in a particularly harsh and inequitable situation for those who retired while § 406 was in effect. They were induced to end their status as Government employees in exchange for a designated benefit. Now that the Government has induced such action it would, at a minimum, be unseemly to renege on the "high one" promise. That result, with its harsh consequences, should not lightly be presumed to have been Congress' intent.

LEON ULMAN

*Deputy Assistant Attorney General*

*Office of Legal Counsel*
