**STATE OF ARKANSAS ex rel. ARKANSAS STATE HIGHWAY COMMISSION**

v.

**Neil GOLDSCHMIDT, Secretary of Transportation of the United States.**

**NO. LR–C–80–192.**

United States District Court, E. D. Arkansas, W. D.

May 21, 1980.

Supplemental Opinion June 25, 1980.

## MEMORANDUM OPINION

EISELE, Chief Judge.

This case arises out of the administration of the Federal-Aid Highway Act of 1956 (the F–AHA), as amended, 23 U.S.C. §§ 101–156. The F–AHA establishes the federal-aid highway system and provides for federal financial support of the system's development. It is administered by the Secretary of Transportation (the Secretary).

For each fiscal year (FY), Congress "authorizes" a certain amount of "budget authority" to be made available to the states for expenditure on federal-aid highways. 23 U.S.C. § 104 directs the Secretary to "apportion" the bulk of this budget authority in accordance with specific formulas which dictate the particular percentage to which each state is entitled.

After apportionment, the states submit proposed federal-aid highway construction projects to the Secretary for approval. 23 U.S.C. § 106. Upon approval of a project, the federal government becomes contractually "obligated" to the submitting state for the federal share of the cost of the project. *Id.* § 104 budget authority which is apportioned to a particular state but which does not become obligated during the fiscal year is carried over into subsequent years. 23 U.S.C. § 118. For the interstate highway system, the carry-over is for only one year. *Id.* For the non-interstate systems, the carry-overs are for three years. *Id.* This carry-over budget authority is added to subsequent apportionments to determine the total amount of budget authority available for obligation by each state in a given fiscal year. *Id.* If available budget authority is not obligated by the end of its carry-over period, it "lapses" and is no longer available to the state. *Id.*

In addition, independent authorizations are provided annually by Congress for certain special programs under other sections of the F–AHA. Under two sections, relatively small amounts of budget authority are apportioned among the states pursuant to formulas other than those in § 104. 23

Steve Clark, Atty. Gen., State of Arkansas, Little Rock, Ark., Thomas B. Keys, Christopher O. Parker, Arkansas Highway and Transp. Dept., Little Rock, Ark., for plaintiff.

William K. Black, Dept. of Justice, Civil Div., Washington, D. C., for defendant.

U.S.C. §§ 144, 152. Under four other sections, budget authority is "allocated" to the states, not pursuant to statutory formulas, but according to discretionary decisions made by the Secretary pursuant to statutory guidelines. 23 U.S.C. §§ 143, 147, 148, and 151.

For FY 1980, Congress authorized $7.9 billion of budget authority to be apportioned under the F–AHA, and the Secretary apportioned that amount. Because of the accumulation and carry-over of previously authorized but unobligated budget authority, a total of approximately $13.6 billion was available for obligation under the F–AHA in FY 1980. In recent years, however, Congress has imposed a ceiling on the total amount of F–AHA budget authority which may be obligated in each fiscal year. The obligational ceiling for FY 1980 was fixed at $8.75 billion. Department of Transportation Appropriations Act of 1980, Pub.L.No.96–131, § 311, 93 Stat. 1023, 1038 (1979). This ceiling covered both budget authority apportioned under § 104 and special budget authority available for obligation under other sections of the F–AHA.

For FY 1980 the Secretary chose to utilize a "first come-first served" approach for dividing up the $8.75 billion. He decided to allow each state to submit projects for § 106 approval as long as that state had not obligated all of its § 104 apportionments and as long as the total ceiling on obligations ($8.75 billion) had not been reached. The Secretary intended to stop approving projects and obligating budget authority when the ceiling was reached. At this point, some states, which had obtained budget authority obligations rapidly, would have availed themselves of a greater percentage of their apportionments than would states which obtained obligations slowly.

In March of 1980, President Carter announced his intention to balance the FY 1981 budget. On March 14, 1980, the Secretary temporarily halted all further F–AHA project approvals. The President decided to "defer," or impound, $1.15 billion of available F–AHA budget authority, ostensibly pursuant to the Impoundment Control Act of 1974, 31 U.S.C. §§ 1400–1407. That action purported to leave an F–AHA obligational ceiling of $7.6 billion, of which only $2.04 billion remained unobligated. On April 2, 1980, the Secretary released 75% of the $2.04 billion for obligation to the states, with the remaining 25% to be released on August 1, 1980. The Secretary also changed the approach for the obligation of the available budget authority, rather than letting it continue to be obligated on a first come-first served basis. He apportioned the remaining $2.04 billion among the states according to the § 104 formulas without regard for the amounts already obligated by each state in FY 1980.

On April 22, 1980, the plaintiff initiated this lawsuit, challenging the Secretary's allocation of the available $2.04 billion. On April 29, the plaintiff moved for expedited proceedings on the issue of preliminary relief which it had requested. On May 5, the plaintiff amended its complaint to include a challenge to the President's authority to defer F–AHA budget authority. Also on May 5, the defendant filed a memorandum in opposition to the plaintiff's motion for a preliminary injunction. On May 6, a hearing was held on the motion for a preliminary injunction and on other issues in the case. On May 13, the plaintiff filed a memorandum brief addressing all the issues raised in the lawsuit. On May 14, the defendant filed a memorandum brief also addressing all the issues in the case.

On May 16, before ruling on preliminary relief, the Court asked the attorneys whether their clients would be willing to submit the case for a final decision on the merits on the basis of the pleadings and evidence then before the Court. The parties have agreed to this arrangement, and the case is now before the Court for a final decision on the merits. The parties are to be commended for facilitating a prompt resolution of this case, which is subject to many time pressures.

In this action the plaintiff seeks declaratory and injunctive relief. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue is properly set in this district pursuant to 28 U.S.C. § 1391(e).

Each of the major issues discussed below appears to involve two alternative grounds for relief. Though it might ordinarily not be necessary for the Court to rule on both alternative grounds for relief, the Court addresses all the issues raised by the parties for two reasons. First, the issues which suggest themselves as alternative grounds for relief are so interrelated as to be mutually dependent. Each cannot, therefore, be completely analyzed without reference to the other. Second, the time pressures which pervade this case require that it not be remanded to this Court, should a higher court disagree with any of this Court's conclusions of law.

## I. THE DEFERRAL ISSUE

Presidents of the United States have impounded funds for a variety of reasons. In 1972 the Secretary of Transportation, acting on behalf of President Nixon in an attempt to control inflation, impounded budget authority intended for obligation under the Federal-Aid Highway Act. This action was challenged by the State Highway Commission of Missouri. The district court granted relief, including a declaratory judgment that the Secretary had no authority to withhold Federal-Aid Highway funds from obligation for reasons of fiscal policy. *State Highway Commission of Missouri v. Volpe*, 347 F.Supp. 950 (W.D.Mo.1972), *aff'd as modified*, 479 F.2d 1099 (8th Cir. 1973). On appeal, the Court of Appeals for the Eighth Circuit affirmed the granting of the declaratory judgment. *State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099 (8th Cir. 1973).

The Court of Appeals held that, even assuming arguendo that the Act did not mandate the spending of all funds appropriated and that the states had no vested right in the funds until the Secretary approved submitted projects, the Secretary had no discretion to withhold his approval of projects *for reasons not contemplated within the Federal-Aid Highway Act. Id.* at 1109–10 (emphasis added). A succinct summary of the court's opinion is as follows:

When the provisions of the Federal-Aid Highway Act are considered as a whole, it is apparent that the Secretary does not have the authority to withhold funds for anti-inflationary purposes. This construction is supported by Section 101(c). After the Attorney General's opinion in 1967 ruled that impoundment of highway funds was permissible under the Highway Act, Congress passed Section 101(c) specifically saying that it "was the sense of Congress that under existing law" the Secretary was not to impound funds under the Federal-Aid Highway Act. Upon subsequent amendment to the Act in 1970, the House Report significantly stated:

"It has been clearly demonstrated that the Federal-aid highway program can operate successfully and efficiently only so long as its planning and programming can be based on an assured comparatively long-term level of financing.

"*The withholding of highway trust funds as an anti-inflationary measure is a clear violation of the intent of the Congress as expressed in section 15 of the Federal-Aid Highway Act of 1968. We again wish to emphasize the clear legislative intent that funds apportioned shall not be impounded or withheld from obligation . . . .*"

(Emphasis ours.) H.R.Rep.No.91 1554, 91st Cong., 2d Sess. (1970); U.S.Code, Cong. & Admin.News at p. 5401 (1970).

*Id.* at 1115–16 (footnote omitted).

In 1974 Congress passed the Impoundment Control Act of 1974 (ICA), 31 U.S.C. §§ 1400–1407. This act was intended to provide a clear procedure for presidential impoundments and to assert congressional control over the budget, in the wake of President Nixon's impoundments. *See* 31 U.S.C. § 1301. The ICA identifies a "deferral of budget authority" as one type of impoundment and defines it as:

(A) withholding or delaying the obligation or expenditure of budget authority (whether by establishing reserves or otherwise) provided for projects or activities; or

(B) any other type of Executive action or inaction which effectively precludes the obligation or expenditures of budget authority, including authority to obligate by contract in advance of appropriations as specifically authorized by law[.]

31 U.S.C. § 1401(1). Section 1403(a) provides that when the President proposes a deferral, he shall transmit a special deferral message to Congress. Section 1403(b) provides that: "[Any] amount of budget authority proposed to be deferred . . . shall be made available for obligation if either House of Congress passes an impoundment resolution disapproving such proposed deferral." Otherwise, the deferral remains in effect. 31 U.S.C. § 1403.

This case raises two questions regarding impoundments: (1) Does the ICA authorize presidential impoundments for which there is no other statutory authorization? and (2) If so, does the Federal-Aid Highway Act nevertheless preclude the impoundment of budget authority authorized thereunder? Analyses of these two questions inevitably overlap because of the language of § 1400 of the ICA, which states:

*§ 1400. Disclaimer*

*Nothing contained in this Act,* or in any amendments made by this act, *shall be construed as—*

(1) asserting or conceding the constitutional powers or limitations of either the Congress or the President;

(2) *ratifying or approving any impoundment* heretofore or *hereafter executed* or approved *by the President or any other Federal officer* or employee, *except insofar as pursuant to statutory authorization then in effect*;

(3) affecting in any way the claims or defenses of any party to litigation concerning any impoundment; *or*

(4) *superseding any provision of law which requires the obligation of budget authority* or the making of outlays *thereunder.*

31 U.S.C. § 1400 (emphasis added). The clear language of the disclaimer indicates that the ICA does not authorize presidential impoundments for which there is no inde-

pendent statutory authorization. As was decided in *State Highway Commission of Missouri v. Volpe, supra,* 479 F.2d 1099, the F–AHA does not provide "statutory authorization" for impoundment, and it does *require* the obligation of budget authority except for reasons contemplated by the act.

Despite the clear language of the ICA, the Court is confronted with a conflicting opinion of the Comptroller General, which has been undisturbed by Congress for over five years. 54 Comp.Gen. 453 (1974). The opinion addresses the question of whether the ICA provides independent statutory authorization for presidential impoundments. *Id.* at 460–68. After describing certain ambiguities in the legislative history of the ICA, the Comptroller General opts for one side of the ambiguities rather than relying on the plain language of § 1400, quoted above.

Finally, other arguments that have been raised against the second interpretation include the arguments (1) that the disclaimer section (section 1001) and the Anti-deficiency Act amendment (section 1002) preclude any assertion or concession of Presidential power to impound, except pursuant to explicit statutory authorization, and (2) that nowhere else in the act is there found such an assertion or concession.

These arguments ignore the fact, however, that the history of section 1013 in the House clearly shows that the provision was intended as a mechanism whereby impoundments could be reviewed and approved or disapproved by Congress, regardless of the presence or lack of independent statutory authorization. Thus, the disclaimer disclaims any assertion or concession of Presidential constitutional power, *or* approval of any impoundment except pursuant to statutory authorization. Section 1013 in a sense does provide such authorization, provided the Congress does not disapprove a proposed deferral.

*Id.* at 467–68.

The Court disagrees with the Comptroller General's conclusion. It is simply

not reasonable—indeed, it borders on the absurd—to argue that Congress, having clearly stated its position in the disclaimer, would intend by a later section of the same act to nullify that disclaimer, especially where neither the language of the act or the legislative history unambiguously requires that result. As indicated, however, Congress has not amended the statute since the Comptroller General's opinion was delivered. Nevertheless, given the mechanics and dynamics by which the legislative process works itself out, Congress' silence in the face of the Comptroller General's decision is not entitled to great weight in the assessment of congressional intent in enacting 31 U.S.C. §§ 1400–1407 when that intent is quite clearly stated in the disclaimer. Furthermore, the Court notes that Congress has not followed the Comptroller General's recommendation of three years ago to repeal the disclaimer and to bring the ICA into conformity with his opinion. Comptroller General of the United States, Report to the Congress, *Review of the Impoundment Control Act of 1974 After Two Years*, 10–12 (June 3, 1977). The Court concludes that the ICA does not authorize presidential impoundments for which there is no other statutory authorization.

This conclusion is reinforced by a fundamental tenet of the legislative process in a democratic society—that governmental action by the citizens and their representatives should be taken knowingly. The impoundment cases of the past decade establish that Congress, not the executive branch, retains ultimate control over the budget and that the President does not enjoy unfettered power to impound. *See, e. g., Train v. City of New York*, 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975); *State Highway Commission of Missouri v. Volpe, supra*, 479 F.2d 1099; *National Council of Community Mental Health Centers, Inc. v. Weinberger*, 361 F.Supp. 897 (D.D.C.1973). To the extent that Congress intends to give the President impoundment authority, it is only reasonable to require that it unambiguously state that intention. Otherwise, confusion results, and litigation is inevitable. A law which clearly provided for the interpretation offered in the Comptroller General's opinion might well be an excellent and desirable law. If Congress agrees, it can, of course, enact such legislation. That is the prerogative of Congress, not of the Comptroller General.

■ Addressing the second question posed above, whether the F–AHA itself precludes the impoundment of budget authority authorized thereunder, the Court again finds a clear expression of congressional intent in the statutory language. 23 U.S.C. § 101(c) states:

It is the sense of Congress that under existing law *no part of any sums authorized to be appropriated for expenditure* upon any Federal-aid system *which has been apportioned* pursuant to the provisions of this title *shall be impounded or withheld from obligation*, for purposes and projects as provided in this title, *by any officer or employee in the executive branch of the Federal Government*, except such specific sums as may be determined by the Secretary of the Treasury, after consultation with the Secretary of Transportation, are necessary to be withheld from obligation for specific periods of time to assure that sufficient amounts will be available in the Highway Trust Fund to defray the expenditures which will be required to be made from such fund.

(Emphasis added.) This language was added in 1968 after Congress was first made aware of the threat of presidential impoundment of F–AHA budget authority by an opinion of the Attorney General. 42 Op.Att'y.Gen.No.32 (1967); Federal-Aid Highway Act of 1968, Pub.L.No.90–495, § 15, 82 Stat. 815 (1968).

In 1973 Congress specifically reaffirmed its intent that F–AHA budget authority not be impounded.

## PROHIBITION OF IMPOUNDMENT
*Senate bill*

This section would prohibit the impoundment of sums authorized to be apportioned by section 104 of title 23, U.S.

Code, which have been appropriated by Congress except specific sums determined by the Secretary of the Treasury as necessary to meet future expenditures from the Highway Trust Fund.

*House amendment*

No comparable provision.

*Conference substitute*

No comparable provision. The fact that this section of the Senate bill is not contained in the conference substitute shall not be construed to indicate anything other than complete agreement with the decision of the United States Court of Appeals for the Eighth Circuit in the case of the State Highway Commission of Missouri v. John A. Volpe, Secretary of Transportation of the United States, et al.

Conf.Rep.No.355, 93d Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Adm. News, pp. 1939, 1976.

In addition, the F–AHA repeatedly employs language which mandates spending. 23 U.S.C. § 104(b) directs that after deducting administrative costs, the Secretary "shall apportion the remainder of the sums authorized to be appropriated for expenditure upon the Federal-aid systems for that fiscal year. . . ." 23 U.S.C. § 118 dictates that sums so apportioned "shall be available for expenditure under this title" and "shall continue available for expenditure" for certain periods thereafter.

So, even if the ICA independently authorizes presidential impoundment, the language of the F–AHA, read in conjunction with *State Highway Commission of Missouri v. Volpe, supra,* 479 F.2d 1099, makes it clear that F–AHA budget authority is subject to the disclaimer of 31 U.S.C. § 1400(4). The Court therefore concludes that any authority which the ICA may be construed to have given the President to defer budget authority was not intended to, and may not, reach F–AHA budget authority.

## II. THE ALLOCATION ISSUE

Preliminarily the Court notes that this issue is not mooted by the Court's resolution of the deferral issue. Both parties agree

that even if the congressionally-imposed ceiling of $8.75 billion is reinstated, the available budget authority will not be sufficient to cover all the projects that are estimated to be ready for submission this fiscal year. Therefore, the Secretary must still decide how to allocate the available budget authority for this fiscal year, and probably for future fiscal years.

The statute limiting the FY 1979 obligations stated:

## OBLIGATION LIMITATION

Sec. 167. (a) Notwithstanding any other provision of law, the total of all obligations for Federal-aid highways and highway safety construction programs for fiscal year 1979 shall not exceed $8,500,000,000. This limitation shall not apply to obligations for emergency relief under section 125 of title 23, United States Code.

(b) Notwithstanding the limitation contained in subsection (a) of this section, the Secretary shall not in any way control—

(1) the rate of obligation of such limitation by allocation of such limitation or in any other manner; and

(2) by priority or otherwise, programs or projects eligible for Federal financial assistance from those funds for such programs and projects which are subject to such limitation, if such programs or projects, are otherwise eligible for such assistance under title 23, United States Code, or any other applicable provision of law.

Surface Transportation Assistance Act of 1978, Pub.L.No.95–599, § 167, 92 Stat. 2689, 2722 (1978). The Secretary interpreted that statute to require the first come-first served approach, which he utilized throughout FY 1979. In September of 1979, for the first time, the obligational ceiling was reached. At that point there was a hiatus of less than one month in the approval of F–AHA projects and the obligation of budget authority. This brief interruption in the administration of the F–AHA did not cause severe problems for the states.

The FY 1980 obligation limitation statute states in pertinent part:

> Sec. 311. None of the funds provided under or included in this Act [Department of Transportation Appropriations] shall be available for the planning or execution of programs, the obligations for which are in excess of $8,750,000,000 for "Federal-Aid Highways" in fiscal year 1980: *Provided*, That this limitation shall not apply to obligations for emergency relief authorized by 23 U.S.C. 125.

. . .

Department of Transportation Appropriations Act of 1980, Pub.L.No.96–131, § 311, 93 Stat. 1023, 1038 (1979). Since the language concerning allocation and control was deleted in this statute, the Secretary interpreted the statute as giving him discretion to allocate available budget authority among the states. He exercised this purported discretion initially by utilizing the first come-first served approach, and then, after the deferral, by apportioning the remaining budget authority pursuant to the § 104 formulas, as noted above.

As did the deferral issue, the allocation issue presents two interrelated questions for resolution by the Court: (1) Does 23 U.S.C. § 104 mandate that available budget authority for the whole fiscal year be apportioned pursuant to the formulas set forth therein? and (2) If the Secretary has discretion to allocate the budget authority under other formulas, is he abusing that discretion by using the present allocation scheme?

In *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136 (1971), the Supreme Court stated that a court reviewing agency action is first to determine whether the Secretary acted within the scope of this authority. If the court finds that he acted within the scope of his authority, it must then consider whether his action satisfied the standards of 5 U.S.C. § 706(2)(A).

In *Los Angeles v. Adams*, 556 F.2d 40 (D.C.Cir.1977), the court confronted a similar problem under the Airport and Airway Development Act of 1970 (AADA), 49 U.S.C. §§ 1701–1743. The AADA authorizes specific amounts of budget authority to be obligated in each of several years and provides a formula for apportioning the budget authority among specified beneficiaries. For FY 1975 Congress, in an appropriations bill, limited the amount that could be obligated under the AADA to less than the amount that was authorized under the AADA. The Federal Aviation Administration (FAA) interpreted this obligational limitation as authorizing it to establish a new priority system for determining how to allocate the available budget authority. The court held that the FAA's action was contrary to the law, stating:

> If the Congress does not appropriate enough money to meet the needs of a class of beneficiaries prescribed by Congress, and if Congress is silent on how to handle this predicament, the law sensibly allows the administering agency, to establish reasonable priorities and classifications.

> However, in the case before us, the shortfall of obligational authority in no way prevented the FAA from adhering to the distributional formula in the mandate of the Act.

> \* \* \* \* \* \*

> We think the FAA acted impermissibly when it used the confrontation and resolution of conflicting statutory mandates on total amounts, as a basis for asserting a new discretion concerning the disbursement of airport development allocations that flew in the face of Congress's unambiguous and uncontradicted demarcation of that discretion. *When Congress modifies a statute* by an appropriations measure, or any other amendment, *the agency administering the statute is required to effectuate the original statutory scheme as much as possible, within the limits of the added constraint.* Section 302 only restricted the *amount* the FAA could obligate. Section 302 said not a word about the method of distributing the money available. We hold that the FAA was required to distribute the money available so as to preserve the allocation formula provided by § 1715(a).

556 F.2d at 50 ("amount" emphasized in original; otherwise, emphasis added).

The AADA is similar to the F–AHA in that it requires an annual apportionment of newly authorized budget authority pursuant to statutory formulas and a carry-over of unobligated previously authorized budget authority. Furthermore, the court opined in *Los Angeles v. Adams*, 556 F.2d at 51, that the pro rata reduction it found mandated by the AADA was consistent with the AADA's goal of encouraging advance planning, which is also a goal of the F–AHA. In this regard, the defendant acknowledges that states tend to plan on the basis of their apportioned authorization levels. Defendant's Exhibit A, affidavit of John S. Hassell, Jr., 4 (May 3, 1980). Apportionment of the obligational ceiling for the entire fiscal year would enable them to plan realistically on the basis of what would actually be available to them and would thereby further the goal of advance planning.

That such an apportionment is intended by Congress is further evidenced by the enactment of § 504 of the Surface Transportation Assistance Act of 1978, Pub.L.No. 95–599, § 504, 92 Stat. 2757 (1978). That section provides that any shortfall in available budget authority occasioned by inadequacies in the Highway Trust Fund, from which the F–AHA is funded, will be apportioned among the states in the ratios established by the substantive statutory formulas of the F–AHA. Each state is apportioned its remaining share of available budget authority at the beginning of the fiscal year. The Secretary should follow the same procedure in this analogous situation occasioned by the congressionally-imposed obligational ceiling or the presidential deferral.

■ The court finds no significant distinctions between *Los Angeles v. Adams, supra,* 556 F.2d 40, and the case *sub judice.* The Court concludes that the reasoning of *Los Angeles v. Adams* is sound and that it is applicable to this case. The Court therefore further concludes that the Secretary was not acting within the scope of his authority, but, rather, was acting illegally when he utilized the first come-first served

approach in FY 1980 before the action of the President and also when he apportioned the $2.04 billion without regard for the amount already obligated by each state under the erroneous first come-first served approach.

The statute imposing the FY 1980 obligational ceiling does not itself mandate any particular approach for the allocation of budget authority under the obligational ceiling. If *Los Angeles v. Adams* were not controlling and the F–AHA did not mandate use of its formulas, the Secretary would still have to decide how to allocate the budget authority. 5 U.S.C. § 706(2)(A) provides that a court reviewing agency action shall ". . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .." The Supreme Court has stated that to find agency action unlawful under this section, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 416, 91 S.Ct. at 823 (citations omitted). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.*

If the *Los Angeles v. Adams* analysis were not controlling and the Secretary retained some discretion in allocating budget authority, § 104 and the rest of the F–AHA should nevertheless provide guidelines and parameters for the exercise of that discretion. A rationale for following the first come-first served approach up until the deferral might be predicated upon the argument that Congress intended the Secretary to follow in FY 1980 the procedure that was mandated in FY 1979 by the Congress. But the argument is untenable. If Congress had intended to require the first come-first served approach in FY 1980 that was mandated in FY 1979, it would surely not have deleted the very language that required

that approach. It may be argued that the removal of that language simply left the Secretary with no mandatory procedure, thereby permitting him to simply use unfettered discretion in devising a procedure. But this argument overlooks § 104 and the history of the period between 1966 and 1975, described below.

The Federal Highway Administration has prepared a relevant publication which was received at the May 6 hearing as Defendant's Exhibit B. Federal Highway Administration, U. S. Department of Transportation, *Financing Federal-Aid Highways* (1979). The publication states that the F–AHA has been subject to obligation limitations since 1966. *Id.* at 30. From 1966 through 1975, these limitations were imposed by the executive branch in the form of impoundments and were "strict in that they held Federal spending *below* anticipated obligation levels to combat severe inflationary pressures." *Id.* at 30, 27 (emphasis in original). "During this era, the limitation was administratively pro-rated among the states to ensure each was able to obligate its fair share of the total. Since 1975, the limitations have been less restrictive and have operated on a first-come, first-served basis." *Id.* at 27. These facts reveal that the Secretary considered it necessary to utilize a pro rata approach for the entire fiscal year when a restrictive limitation was in effect. This revelation supports the Court's conclusion that it would be an abuse of discretion for the Secretary to utilize any other approach under these circumstances, even if the F–AHA did not itself mandate the § 104 pro rata approach. This abuse of discretion is not mitigated by the rationales offered by the Secretary, rationales which could as well be used to upset other congressionally-determined priorities.

In addition, the Secretary's present approach for allocation of the remaining $2.04 billion has a very uneven impact in that it adversely affects some states while benefitting others on the arbitrary basis of the amounts each state has obligated prior to March 14, 1980. To point out the gross disparities in treatment of the different states, the Court notes that the percentage of the FY 1980 apportionment to the respective states which remains available under the Secretary's present plan ranges from 30% in the District of Columbia and 44% in two states to 220% in Maryland. Plaintiff's Exhibit D. Clearly, any plan which yields such results is arbitrary and capricious and abusive of any reasonable discretion vested in the planner. In this case, it effects a flagrant abrogation of congressional intent.

Arkansas' situation is illustrative, although not uniquely egregious. For FY 1980, Arkansas was apportioned and allocated approximately $93.5 million. Plaintiff's Exhibit A 2. The state had carry-over authority of $13.5 million. *Id.* Therefore, under the first come-first served approach, it might have obligated up to $107 million, assuming it submitted enough projects before the obligational ceiling was reached. Arkansas estimated that it would submit approximately $99.6 million of projects for approval in FY 1980. Joint Exhibit A, Joint Stipulation of Facts. Under the *Los Angeles v. Adams* approach, Arkansas would be entitled to approximately $72 million in budget authority even if the presidential deferral were upheld. Under the Secretary's approach and with the deferral, Arkansas would receive only $59 million— $39 million obligated before March 14, and $20 million obligated thereafter. This allocation works a double hardship on Arkansas, which had been allocated $14 million of one-year budget authority for a particular project at the Secretary's discretion. This budget authority will lapse if not obligated by September 30, 1980. Under the reduced $20 million ceiling applicable to Arkansas, the state would have to make a hard choice between virtually abandoning all its other projects or giving up the $14 million one-year authorization. The inclusion of allocated discretionary budget authority under the Secretary's new ceilings arbitrarily impacts on those states which have considerable sums of unobligated and available discretionary budget authority.

For the foregoing reasons, the Court concludes that both the use of the first come-

first served approach in this fiscal year and the use of the defendant's reallocation scheme for the $2.04 billion, described above, were arbitrary and capricious and abusive of any discretion lodged in the Secretary.

■ Two other issues raised by the parties deserve but brief attention by the Court. The defendant argues that the deferral issue is not justiciable but is a matter to be resolved exclusively by the executive and legislative branches. The earlier impoundment cases establish that a challenge to a President's decision not to spend the amount authorized under a statute is justiciable. *See Train v. City of New York, supra,* 420 U.S. 35, 95 S.Ct. 839; *State Highway Commission of Missouri v. Volpe, supra,* 479 F.2d at 1106–07; *National Council of Community Mental Health Centers, Inc. v. Weinberger, supra,* 361 F.Supp. at 900–01. The ICA does not change this result. The defendant argues that if the President has complied with the law, the courts may not review his actions. It is, however, the province of the courts to determine *whether* the President has complied with the law.

■ The plaintiff argues that the President's purported deferral was in fact a "recission" under the ICA, which could not go into effect without congressional approval. The Court finds no merit in this argument. Although a lapse of available budget authority is possible under the deferral, no lapse is required. The language of the ICA makes it clear that the President's action in this situation was a deferral, not a recission.

### RELIEF

Having concluded that the plaintiff is entitled to relief on the two major claims presented, the Court must fashion appropriate relief. In considering the relief to be granted, the Court is necessarily concerned with the time pressures which pervade this litigation. The principal time pressure arises from the fact that if this case drags on until October 1 without a final resolution and without the release of the impounded budget authority, the President's deferral will be a fait accompli. A deferral merely delays the expenditure of budget authority, and it may not delay that expenditure beyond the end of the fiscal year. 31 U.S.C. § 1403. Therefore, a delay beyond September 30, 1980, the end of FY 1980, would result in a de facto victory for defendant. The Court must, therefore, try to fashion relief which will expedite the ultimate conclusion of this litigation.

Another time pressure arises from the fact that if the Secretary is allowed to continue obligating budget authority under the present scheme, the total available amount of budget authority will continue to dwindle, and the distribution among the states may be further skewed. This concern suggests that the Secretary not be allowed to continue obligating budget authority under his present allocation plan. On the other hand, if all F–AHA obligations are prohibited during a lengthy appeals process, other states' highway programs may be damaged by the interruption.

■ The relief to be granted on the deferral claim is obvious—the Secretary must make available to Arkansas under the F–AHA its proper share of the $1.15 billion of budget authority purportedly impounded by the President.

■ It is more difficult to fashion relief based on the claim of misallocation of the available budget authority. Should the Court order a reallocation for the entire United States or just for Arkansas? If limited to Arkansas, two problems arise. First, such limited relief may necessitate the bringing of similar lawsuits all over the country. Second, continued obligations to other states under an inappropriate scheme could conceivably interfere with the administration of the F–AHA to an extent which would adversely affect all states, including Arkansas. Nevertheless, the Court concludes that it should fashion relief which will directly protect only the plaintiff State of Arkansas, thereby avoiding overstepping traditional bounds of judicial authority in proceedings of this genre.

One element of that relief should be a requirement that the Secretary retain sufficient budget authority to satisfy any relief to which Arkansas may be entitled. Such a requirement will be effective immediately and will continue in effect pending any appeal of this case unless otherwise ordered by this Court or by a court having appellate jurisdiction of the case. The requirement of this paragraph will not be subject to the stay referred to in the following paragraph, although it may, upon proper showing, be stayed in a separate order.

Another element necessarily requires that the Secretary recalculate, in accordance with this opinion, the amount of F–AHA budget authority available to Arkansas and the other states for FY 1980. The Secretary will be required to file with this Court a report showing the recalculated amount available to Arkansas for obligation and his precise method of computing same, by the eleventh day following the date of this opinion unless a notice of appeal is filed on or before the tenth day following the date of this opinion. If a notice of appeal is filed within ten days, the requirements of this paragraph will be stayed for five days from the date of its filing in order to give the defendant an opportunity to apply for a further stay.

■ The remaining problem is to determine how the Secretary should recalculate the amount to be made available. Three possibilities arise. One is to apportion the entire fiscal year obligational ceiling pursuant to the average percentage for each state derived from the § 104 formulas. This option has some merit because it is simple. The shortcoming is that it does not adequately provide for the allocation of budget authority which is independently authorized to be allocated under other sections of the F–AHA (estimated during oral argument to amount to 12% or 13% of the total). This shortcoming may frustrate congressional intent, since these independent authorizations are designed to provide some administrative discretion in dealing with specific situations which are too idiosyncratic to be dealt with by Congress on the statutory level.

A second possibility is to pro rate the authorization, apportioning or allocating under each section the percentage of the total authorization for that section that is equal to the percentage of the total F–AHA budget authority represented by the obligational ceiling. In other words, the Secretary might determine what percentage $8.75 billion is of $13.6 billion and then apportion or allocate that percentage of the authorized budget authority for each section of the F–AHA under that section. This option appears to be equitable and to comport with *Los Angeles v. Adams, supra,* 556 F.2d 40, although that case did not deal with the problem of varied formulas and administrative discretion in certain sections of the relevant act. This option has a potential negative impact, however, in that if only a percentage of the authorizations for some sections of the F–AHA is obligated in the fiscal year, the remaining portions of the authorizations, which are for only one year and which do not carry over, may lapse.

The third possibility would solve the problem just mentioned but might not provide as equitable a distribution as the other two options. It would be to allocate the full amount of budget authority authorized under the sections other than § 104 and to apportion the amount remaining pursuant to the § 104 formulas.

After considering these options, the Court concludes that the choice of using one of the options or, indeed, of using other possible variations should be a matter left, in the first instance, to administrative discretion. The Secretary's office has had experience in this area from 1966 to 1975. He should be able to draw on the expertise of his staff members in furthering the congressional intent behind the F–AHA. The Court will not at this point, therefore, impose a particular formula for the reapportionment of budget authority to Arkansas but will permit the Secretary to propose a plan which he believes comports with this decision and with the F–AHA, as it has been interpreted by the Court, and which fully protects the

plaintiff's rights and interests as discussed above.

The plaintiff will have five days after the defendant files his report within which to file its objections setting forth specifically how the defendant's said report fails to conform with the opinion of this Court. The Court may also, *sua sponte*, review defendant's submissions to determine whether they comply with this opinion. If no change or alteration is ordered within ten days after the filing of defendant's report, or if no order is entered within that ten day period extending same, the defendant's report will be deemed accepted in compliance with this opinion.

The plaintiff is entitled to declaratory and injunctive relief as described in this opinion.

It is so Declared and Ordered.

## SUPPLEMENTAL OPINION

In compliance with the Court's directive, the parties have addressed the issue of the recalculation of the ceiling on budget authority which Arkansas is entitled to have obligated to it in fiscal year ("FY") 1980 under the Federal-Aid Highway Act ("F–AHA"), 23 U.S.C. §§ 101–156, and this Court's decision of May 21, 1980, *Arkansas v. Goldschmidt,* 492 F.Supp. 621 (E.D.Ark. 1980). A hearing was held on June 19, 1980, at which both parties were heard on the issue. Having carefully considered all the written pleadings, briefs, and oral arguments in the case, the Court now resolves the issue. This Memorandum and Order should be read in conjunction with the Memorandum Opinion of May 21, 1980. *Id.* It should also be read in the light of the Court's comments and the parties' arguments at the June 19 hearing.

The phrase "obligational ceiling" is used to describe a limit on the amount which may be "obligated" in a particular fiscal year. The imposition of an obligational ceiling on F–AHA budget authority for FY

1980 has made it impossible to satisfy all elements of congressional intent embodied in the F–AHA. To the extent possible, however, the Court should require that any administration of the F–AHA conform with and implement ascertainable statutory intent.

In its Memorandum Opinion the Court determined that each state should have the opportunity to obligate its pro rata share of the restricted amount of budget authority which may be obligated in FY 1980. The Court agrees with both parties that each state's basic obligational ceiling should reflect that state's share of the nationwide total of the budget authority apportioned or allocated under statutory or administrative formulas ("formula funds"). That is, the Court adopts as a starting point the "first possibility" identified in the Memorandum Opinion and discussed by both parties in their pleadings.

Having adopted this starting point, the Court must decide what, if any, other factors should be considered in establishing state obligational ceilings. The most difficult issue is whether each state's obligational ceiling should reflect not only that state's share of the formula funds, but also its share of budget authority allocated at the discretion of the Secretary of Transportation ("discretionary funds").

The defendant has argued that each state's ceiling should be proportional only to its share of the *formula* funds. In other words, each state's obligational ceiling should be a percentage of the nationwide obligational ceiling which is equal to the percentage of nationwide formula funds represented by that state's formula funds. Since Arkansas receives slightly less than 1% of the nation's formula funds, Arkansas' overall obligational ceiling would, under this approach, be slightly less than 1% of the nationwide ceiling of $8.567 billion.[1]

The plaintiff objects that such an approach is not warranted, since the formula funds represent only about 90% of the total

1. Congress imposed a nationwide obligational ceiling of $8.75 billion for FY 1980. After a deduction for administrative costs, approxi-

mately $8.567 billion remains available for obligation to the states.

FY 1980 budget authorizations. Roughly 10% of the FY 1980 authorizations are *discretionary* funds which are not distributed pursuant to statutory and administrative formulas, but are allocated at the discretion of the Secretary of Transportation ("the Secretary"). The Secretary's approach would not take account of the distribution of these discretionary funds in calculating individual state ceilings. It would completely ignore the defendant's own decisions controlling the distribution of roughly 10% of the total F–AHA budget authorizations and would derive percentages for each state based on only the remaining 90%. The Secretary has offered no tenable rationale for distributing obligational authority among the states on the basis of *parts* of the F–AHA's distributional scheme while ignoring other equally significant parts of the distributional scheme. And the Court can find no rational basis for such an approach.

The Court therefore finds merit in the plaintiff's objection. Obviously, the reason to tie each state's obligational ceiling to the statutory provisions is to preserve the congressional scheme for distributing spending power among the states. Reference to each state's share of formula funds is designed to preserve the statutory intent to apportion and allocate formula funds, the bulk of F–AHA budget authority, pursuant to specific formulas. There is, however, no statutory intent that discretionary funds be allocated pursuant to any specific formula or formulas. Rather, there is a clear statutory intent that the discretionary funds part of the budget authority authorized each year be allocated at the discretion of the Secretary. This provides a distribution scheme which allows some flexibility for dealing with the most pressing highway needs each year.

█ The plaintiff suggests that the statutory scheme of providing separately for formula and discretionary funds can be maintained under the FY 1980 ceiling and

should, therefore, be reflected in each state's obligational ceiling. The Court agrees and concludes that the clear statutory intent requires such an approach. To determine the basic obligational ceiling for each state, one should first determine what percentage of the *total* fiscal year authorizations is represented by the nationwide fiscal year ceiling. For FY 1980 the ceiling is approximately 97.799% of the FY 1980 F–AHA authorizations.[2] That percentage may then be applied to the formula funds for each state to determine the basic ceiling for each state, which will thereby reflect that state's share of the formula funds.

This basic ceiling should then be augmented by the same percentage of any discretionary funds allocated to each state during the year. Adding the augmentation to the basic ceiling, we find that each state's proper obligational ceiling for FY 1980 is approximately 97.799% of the state's formula funds plus approximately 97.799% of the state's discretionary funds, which is equal to approximately 97.799% of each state's *total* apportionments and allocations (formula and discretionary) for FY 1980. The plaintiff has indicated in its latest pleading that the total formula and discretionary funds apportioned and allocated to Arkansas in FY 1980 amount to $93.482 million. Based on this figure, Arkansas' ceiling, before adjustments, is estimated to be $91,424,461.

The disparity between this result and the result which would obtain under the Secretary's approach reinforces the Court's decision. While Arkansas receives slightly less than 1% of the nation's formula funds, it has received over 2% of the nation's discretionary funds in FY 1980. These discretionary funds will lapse if not obligated by the end of the fiscal year and will no longer be available to Arkansas. If Arkansas' obligational ceiling does not take account of Arkansas' relatively high percentage of discretionary funds in FY 1980, the Arkansas

2. In the plaintiff's latest pleading, the following figures were used, and the Secretary has not objected that they are inaccurate: $8.567 billion (FY 1980 ceiling after administrative cost deduction) divided by $8.7599 billion (FY 1980 authorizations after administrative cost deduction) equals 97.799%.

ceiling will be lower (approximately $83.588 million), and Arkansas will be forced to make considerable sacrifices in formula funds spending in order to obligate the discretionary allocations. This result would skew the clear statutory intent to make spending power available to each state pursuant to *both* specific formulas *and* the Secretary's exercise of discretion with respect to special programs.

The Secretary has proposed two types of adjustments to the ceiling, to which the plaintiff has objected. The first is an adjustment which reduces the ceilings for most states, including Arkansas, by a pro rata amount of the excess obligations of states which have already obligated amounts above their appropriate ceilings, as defined in this Memorandum and Order. A few states appear to have exceeded their appropriate FY 1980 ceilings because the policy heretofore followed by the Secretary permitted greater obligations by some states than does the Court's approach. These excesses cannot be recovered. They are irretrievably contractually committed to the states. If an adjustment were not permitted for them, there would not be enough obligational authority to allow each state to obligate to the full extent of its appropriate ceiling under any nationwide remedial scheme. Even though the relief granted by the Court is for only Arkansas, the approach utilized by the Court should be one which could be evenly and fairly applied to all states.

■ The Court, therefore, agrees with the Secretary that adjustments should be made to take care of these over-obligations, not on the theory that this approach reflects statutory intent, but rather in recognition of the fact that a mistake has been made which cannot be otherwise corrected. A solution which spreads the mistake proportionately among all the states is an appropriate use of discretion in such circumstances. The statute does not preclude the Secretary from exercising discretion in this way.

The adjustment will be allowed only for excesses obligated on or before May 21,

1980, however, since on that date the Court ordered the Secretary to preserve sufficient budget authority to effectuate any relief to which Arkansas might be entitled. If data for May 21 are not available, data from the latest possible prior date may be used in making the adjustments. As indicated in the defendant's latest pleading, the adjustments will probably have to be made in at least two stages.

■ The Secretary has also proposed an adjustment to avoid any state's being forced to let budget authority lapse in FY 1980. The Court agrees with the Secretary that an "anti-lapse" adjustment, which finds precedent in prior practice, is not contrary to statutory intent. Therefore, such an adjustment will be permitted.

The Court does not have before it all the figures necessary to determine precisely how much budget authority must be made available to Arkansas for obligation in this fiscal year. Nevertheless, time being so critical in this case, the Court considers it appropriate now to order the defendant to cease delaying approval of Arkansas' proposed F–AHA projects. The Court will consider granting a stay of this order if a notice of appeal and a motion to expedite appeal are filed within ten days from the date of this order. If a notice of appeal and a motion to expedite are not filed within that period, this Court will not be inclined to grant a stay. In the meantime, the order is effective immediately.

It is therefore Ordered that the defendant be, and he is hereby, directed to immediately begin the standard and usual processes for the approval or disapproval of Arkansas' proposed F–AHA projects and to complete the processes within the usual and ordinary time-frames for project review. The defendant is further directed to forthwith make available to Arkansas for obligation the amount of budget authority to which it is entitled under this Memorandum and Order. That amount, and the manner of its calculation, shall be reported to the Court by the defendant or his representative by 2:00 p. m., Central Daylight Time, on Friday, June 27, 1980. Any objections

thereto shall be reported to the Court by 12:00 noon on Tuesday, July 1, 1980.

It is further Ordered that the defendant be, and he is hereby, directed to retain and protect under the F–AHA sufficient obligational authority to make available to Arkansas a total of $91,424,461 for FY 1980.

It is further Ordered that the defendant be, and he is hereby, directed to preserve, until final resolution of this case, a record of the order of the filing of F–AHA project proposals for all states, based on the filing times and dates.

